ORIGINAL

#04 5520

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | |
|---|---|
| **Bryndon Fisher** and **Bruce Reid**, derivatively on behalf of **Federal National Mortgage Association**, | **FILED** |
| Plaintiffs, | **AUG 2 6 2013** |
| v. | U.S. COURT OF FEDERAL CLAIMS |
| **The United States of America**, | |
| Defendant, | No. **13-608 C** |
| and **Federal National Mortgage Association** | |
| Nominal Defendant. | |

## VERIFIED SHAREHOLDER DERIVATIVE COMPLAINT

Upon personal knowledge as to their own acts and status, and based upon their investigation, their counsel's investigation, and information and belief as to all other matters, Plaintiffs Bryndon Fisher and Bruce Reid ("Plaintiffs"), derivatively on behalf of the Federal National Mortgage Association ("Fannie Mae" or the "Company"), allege as follows:

### SUMMARY OF THE ACTION

1.     This is a shareholder derivative action on behalf of Fannie Mae against The United States of America ("United States" or the "Government") and nominal defendant Fannie Mae. This derivative action seeks just compensation for the taking of the private property of Fannie Mae for public use by the United States, including the

Department of the Treasury ("Treasury"), the Federal Housing Finance Agency ("FHFA"), and their respective agents.

2.      In 2012, the Government imposed a "Net Worth Sweep" on Fannie Mae, which required the Company to pay its entire net worth in the form of a dividend to the U.S. Treasury every quarter in perpetuity. The Government's taking of the entire net worth of Fannie Mae effectively destroyed all value in the Company and amounts to a blatant overreach by the Government in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution.

3.      Fannie Mae is a private, shareholder-owned corporation charged with maintaining a stable and liquid secondary mortgage market by purchasing mortgage loans from other financial institutions, issuing and purchasing mortgage-backed securities ("MBS"), and guaranteeing privately-owned mortgage-backed securities.

4.      During the mortgage-related financial crisis that began in 2007, Congress created the FHFA to oversee the operations of Fannie Mae and empowered the FHFA to serve as conservator to the Company when necessary to preserve its financial health. When acting as conservator, the FHFA is obligated by statute to manage the Company with the goal of putting it in a sound and solvent financial condition while preserving and conserving its assets.

5.      Congress also authorized the Treasury Department to provide limited financial assistance to Fannie Mae. Treasury was authorized to provide this assistance by purchasing securities issued by the Company if it determined that such purchases would help stabilize financial markets, prevent disruptions in the mortgage markets, and protect taxpayers.

6.    On September 7, 2008, the Director of the FHFA, a federal government agency, placed Fannie Mae into conservatorship, committing to "operate the [Company] until [it is] stabilized."[1] FHFA continues to act as Fannie Mae's conservator with sole control and direction of all the Company's affairs. This suit does not challenge the legality of the FHFA's initial placement of Fannie Mae into conservatorship or claim that action was a taking—but rather challenges the Government's subsequent amendment to the terms of the conservatorship through the imposition of the Treasury Department's "Net Worth Sweep" in 2012.

7.    In conjunction with the conservatorship, Treasury and the FHFA executed a Preferred Stock Purchase Agreement ("PSPA") in 2008. Under the PSPA, the Treasury Department purchased one million shares of Government Preferred Stock from Fannie Mae in exchange for a funding commitment that allowed the Company to draw up to $100 billion from Treasury as needed to ensure it maintained a positive net worth. The Government Preferred Stock for each company has a liquidation preference equal to $1 billion plus the sum of all draws by each company against Treasury's funding commitment. The Government is entitled to a cumulative annual dividend equal to 10% of the outstanding liquidation preference. The PSPA also grants Treasury warrants to purchase up to 79.9% of the Company's common stock at a nominal price.

8.    Shortly after the Government imposed the conservatorship, Fannie Mae declared large non-cash losses, largely due to the write-down of substantial deferred tax assets and large loss reserves on their balance sheets. These accounting adjustments, which reflected an overly pessimistic view about Fannie Mae's financial future,

---

[1] *See* Press Release, FHFA, Statement of FHFA Director James B. Lockhart, at 6 (Sept. 7, 2008), available at http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf.

decreased the Company's operating capital, and as a result, the Government advanced

over a hundred billion dollars to shore up the Company's balance sheet. These actions,

in turn, substantially increased the annual dividends due to the Government.

9.      By 2012, with the housing market on a recovery path, Fannie Mae was

again profitable. The Company's actual realized loan losses were tens of billions of

dollars less than had been expected, and as a result, the Company could reverse the

earlier write-downs of deferred tax assets and loss reserves. With these negative assets

off their balance sheet, Fannie Mae's true financial strength was revealed. The Company

posted sizable profits and announced that it expected to be profitable into the

foreseeable future.

10.      By the end of the first quarter of 2012, Fannie Mae was so profitable that it

had sufficient money to not only pay its Government dividends but also to pay dividends

to non-government stockholders. With future profits expected to increase dramatically,

the Company was positioned to redeem the Government Preferred Stock, provide value

to the Company's other preferred and common stock, and retain earnings. But rather

than allow that to occur, the Government acted unilaterally to change the terms of its

agreements and take all remaining profits in the Company for public use. Instead of

exercising its right to purchase up to 79.9% of the Fannie Mae's common stock or

enabling the Company to redeem its Government Preferred Stock, two Executive Branch

agencies conspired to ensure that the Government—and only the Government—would

be the beneficiary of Fannie Mae's newfound financial strength.

11.      On August 17, 2012, the Government unilaterally amended the terms of

the PSPA with Fannie Mae to effect this result. Under the Third Amendment to the

PSPA (the "Net Worth Sweep"), which went into effect on January 1, 2013, the Government required Fannie Mae to pay the Treasury Department dividends equal to the Company's entire net worth, taking the entirety of the Company's value. Under the original stock certificates, Treasury's dividend was paid quarterly in the amount equal to an annual ten percent of the Government Preferred Stock's outstanding liquidation preference. Under the Net Worth Sweep, every dollar of Fannie Mae's net worth, less a small, temporary capital reserve, must be provided to the United States.[2] The Company was effectively prohibited from *ever* retaining earnings, creating a capital reserve, or providing dividends to non-government shareholders. As a result, the Government's Net Worth Sweep completely deprived the Company of all of its reasonable economic value.

12.     By unilaterally executing the Net Worth Sweep, the Government has reaped an enormous windfall for the U.S. Treasury. On or about June 30, 2013, Fannie Mae paid the Treasury Department the largest quarterly dividend in U.S. history: $59.4 billion. In September 2013, Fannie Mae will make its next quarterly dividend payment to Treasury: $10.2 billion. Since the imposition of the Net Worth Sweep, Fannie Mae will have paid the Government $69.6 billion in dividends, whereas under the original PSPA the Company would have only been obligated to pay $5.8 billion. The difference, $63.8 billion, represents the windfall the U.S. Treasury has received since the Government began sweeping every dollar of profits from Fannie Mae.

13.     All told, as of September 2013, the Company will have paid over $105 billion in dividends to the United States. To put this in perspective, at the time of the Net Worth Sweep, the total liquidation preference for the Government Preferred Stock

---

[2] The specified capital reserve steadily declines to zero in 2018.

in Fannie Mae was $117.1 billion. Absent the Net Worth Sweep, Fannie Mae would have had the option of using some or all of its substantial profits in 2013 to dramatically reduce its outstanding Government debt. But the Net Worth Sweep forbids doing so.

14.     Under the Net Worth Sweep, the amounts paid by Fannie Mae in dividends do not—and will not ever—reduce the outstanding liquidation preference of the Government Preferred Stock or reduce the amount of such stock outstanding. Therefore, the total liquidation preference, despite the Company having paid an additional $63.8 billion in dividends under the Net Worth Sweep, remains at $117.1 billion. If Fannie Mae were allowed to reduce the Government's liquidation preference through its government dividends, it would have paid nearly 90% of that preference by September 2013 and be on track to pay off its Government draws with interest by the end of 2013. But since the Net Worth Sweep now requires that the dividend payments be equal to the total net worth of the entire Company, it will *never* be possible for Fannie Mae to reduce, much less eliminate, its government debt. The Government will continue to take the entire Company's net worth for as long as it remains in business. And it will *never* be possible for Fannie Mae to escape conservatorship.

15.     The Government's actions are designed to benefit taxpayers, not the Company or its private stockholders. Far from hiding its motive, the Government's stated goal of the Net Worth Sweep is to take "every dollar of earnings [Fannie Mae] generates ... to benefit taxpayers." While this may be a laudatory goal, the Government cannot simply appropriate private property, let alone take the entire net worth of a legal, private company, without the payment of just compensation. And the Government

6

cannot enrich itself through a self-dealing pact among Government agencies to take the entire reasonable value of Fannie Mae for public use by taxpayers.

16.     The Government's Net Worth Sweep was not the result of an arm's length agreement. On the contrary, the Government amended its own Government Preferred Stock Agreement by way of an "agreement" between two agencies of the federal government: the Treasury Department and the FHFA. In essence, the Government agreed with itself to appropriate private property for the use of the Government.

17.     In executing the Net Worth Sweep, the Treasury Department openly acknowledges that a primary purpose is to "expedite the wind down of Fannie Mae" as a going concern.[3] As Treasury explains, as a result of the Net Worth Sweep, Fannie Mae "will be wound down and will not be allowed to retain profits, rebuild capital, [or] return to the market in [its] prior form."

18.     While it is debatable whether the Net Worth Sweep constitutes sound economic policy, one fact is unmistakable: the result of the Government's actions are a total taking of all economic value of Fannie Mae. Under the Fifth Amendment to the U.S. Constitution, Fannie Mae is owed just compensation.

## JURISDICTION AND VENUE

19.     This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1491(a). Venue is proper in this Court pursuant to 28 U.S.C. § 1491(a).

20.     Pursuant to Rule of the Court of Federal Claims 23.1(b)(2), this is not a collusive action to confer jurisdiction that this Court would otherwise lack.

---

[3] *See* Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/press-releases/Pages/tg1684.aspx.

## PARTIES

21.     Plaintiff Bryndon Fisher ("Fisher") is a citizen of California. Fisher currently owns and, at all relevant times, has owned 3,250 shares of nominal defendant Fannie Mae's common stock. Fisher has owned Fannie Mae common stock prior to, at the time of, and continuously since the Treasury Department's Net Worth Sweep announcement on August 17, 2012.

22.     Plaintiff Bruce Reid ("Reid") is a citizen of California. Reid currently owns and, at all relevant times, has owned 29,000 shares of nominal defendant Fannie Mae's common stock. Reid has owned Fannie Mae common stock prior to, at the time of, and continuously since the Treasury Department's Net Worth Sweep announcement on August 17, 2012.

23.     Defendant United States of America includes the U.S. Department of Treasury ("Treasury"), the Federal Housing Finance Agency ("FHFA" or the "Conservator"), and agents acting at the direction of Treasury and/or the FHFA.

24.     Nominal Defendant Federal National Mortgage Association ("Fannie Mae" or the "Company") is a federally chartered, government-sponsored enterprise that supplies capital and liquidity for residential mortgages. Fannie Mae is a publicly traded private corporation, has a Board of Directors ("Board"), and is required to report to the Securities and Exchange Commission ("SEC"). Fannie Mae's by-laws expressly provide that Delaware General Corporation Law applies to the conduct of the Company.

## NON-DEFENDANT DIRECTORS

25.     William Thomas Forrester ("Forrester") has served as a Fannie Mae Board member since 2008.

26.    Brenda J. Gaines ("Gaines") initially became a director of Fannie Mae in September 2006, before the conservatorship, and the FHFA reappointed her to Fannie Mae's Board in December 2008.

27.    Charlynn Goins ("Goins") has served as a Board member of Fannie Mae since 2008.

28.    Frederick B. "Bart" Harvey III ("Harvey") initially became a director of Fannie Mae in August 2008, before the conservatorship, and the FHFA reappointed him to Fannie Mae's Board in December 2008.

29.    Robert H. Herz ("Herz") has served as a Board member of Fannie Mae since 2011.

30.    Philip A. Laskawy ("Laskawy") became a director and Chairman of Fannie Mae's Board in September 2008.

31.    Timothy J. Mayopoulos ("Mayopoulos") has served as a Board member of Fannie Mae since June 2012.

32.    Egbert L. J. Perry ("Perry") has served as a Board member of Fannie Mae since December 2008.

33.    Jonathan Plutzik ("Plutzik") has served as a Board member of Fannie Mae since November 2009.

34.    David H. Sidwell ("Sidwell") has served as a Fannie Mae Board member since December 2008.

35.    The directors of Fannie Mae are not named as defendants because, as explained *infra*, the Conservator has effectively assumed all of the powers of the directors. The directors, therefore, are not indispensable parties to this action.

## CONSTITUTIONAL PROVISION

36.    Plaintiffs' claim is governed by the Fifth Amendment to the United States Constitution, which provides in pertinent part that no person shall "be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

## FACTUAL ALLEGATIONS

### History of Fannie Mae and Relevant Statutes

37.    Fannie Mae was created by federal statute in 1938, at the request of President Franklin D. Roosevelt, in an effort to provide a much needed supply of capital to the nation's home mortgage industry. Initially, it was authorized to purchase only those mortgages that were insured by the Federal Housing Administration ("FHA"). For the first thirty years of its existence, Fannie Mae was operated by the federal government.

38.    In 1968, Fannie Mae was privatized pursuant to the Housing and Urban Development Act of 1968 ("HUD Act"). The HUD Act effectively partitioned Fannie Mae into two separate and distinct entities: a reconstituted Fannie Mae and the Government National Mortgage Association ("Ginnie Mae"). Fannie Mae was reorganized as a government-sponsored private corporation tasked with serving the self-supporting secondary mortgage market and authorized to purchase both FHA-insured and non-insured mortgages. Ginnie Mae continued as a federal agency, responsible for the then-existing special assistance programs.

39.    Together with its sister entity, the Federal Home Loan Mortgage Association ("Freddie Mac"), these private companies are commonly referred to as

Government Sponsored Enterprises ("GSEs"), reflecting the fact that they are private corporations created by Congress with the goal of increasing liquidity in the mortgage market. Today, Fannie Mae endeavors to achieve this goal by purchasing mortgages originated by private banks and bundling these mortgages into mortgage-related securities that can be sold to investors. By creating this secondary mortgage market, Fannie Mae increases liquidity for private banks, allowing them to make additional loans to individuals to purchase homes.

40.     Since 1968, Fannie Mae has been owned by private shareholders, has obtained funding from private capital, including common and preferred stock, and has publicly traded on the New York Stock Exchange ("NYSE").[4] Prior to September 6, 2008, Fannie Mae regularly paid dividends on its common and preferred stock. And before 2007, the Company was also consistently profitable. In fact, Fannie Mae had not reported a full-year loss since 1985.

41.     In 1992, Congress enacted the Federal Enterprises Financial Safety and Soundness Act (the "Safety and Soundness Act"). The Safety and Soundness Act created the Office of Federal Housing Enterprise Oversight ("OFHEO") as the new regulator for Fannie Mae, imposed minimum capital requirements on the Company, and provided OFHEO with the authority to impose a conservatorship in the event that Fannie Mae became critically undercapitalized.

42.     In 2007, the nation's mortgage market began a precipitous decline as part of the global financial crisis, and an increasing number of mortgages fell into

---

[4] On June 16, 2010, Fannie Mae announced that, at the direction of the FHFA, their stock would be delisted from the NYSE. On July 7, 2010, Fannie Mae stock ceased trading on the NYSE, and on the following day, July 8, 2010, the Company began trading on the OTC Bulletin Board under the symbol FNMA. Fannie Mae stock continues to be privately traded on the OTC Bulletin Board.

delinquency and default. Consequently, the markets lost confidence in the financial health of Fannie Mae. Government officials attempted to allay these concerns and shore up confidence in the GSEs. James B. Lockhart, then-Director of OFHEO confirmed that Fannie Mae was "adequately capitalized, holding capital well in excess of [regulatory requirements]" and had a "large liquidity portfolio[], access to the debt market and over $1.5 trillion in unpledged assets."[5]

43.     Nevertheless, given the critical importance of the housing market to the broader U.S. economy and the need to instill confidence in the market, Congress enacted the Housing and Economic Recovery Act of 2008 ("HERA"). HERA created the Federal Housing Finance Agency ("FHFA") as the successor to OFHEO and provided the FHFA with expanded regulatory powers. HERA further defined the FHFA's powers to place Fannie Mae into conservatorship and, for the first time, authorized Fannie Mae to be placed into receivership under certain statutorily-defined circumstances.

## FHFA Places Fannie Mae in Conservatorship

44.     On September 7, 2008, OFHEO Director Lockhart announced that the FHFA had placed Fannie Mae in conservatorship.[6] Under HERA, the FHFA became responsible for "preserv[ing] and conserv[ing] [Fannie Mae's] assets and property" and managing the Company so as to restore it to a "sound and solvent condition." 12 U.S.C. § 4617(b)(2)(D). Lockhart described conservatorship as "a statutory process designed to stabilize a troubled institution with the objective of returning [Fannie Mae] to normal

---

[5] Lockhart would later become Director of the FHFA.

[6] The actual imposition of the conservatorship occurred on the prior day, September 6, 2008.

business operations." The FHFA pledged to act as the Company's conservator until it
was stabilized.

45.     Lockhart announced that "in order to conserve over $2 billion in capital
every year, the common and preferred stock dividends will be eliminated, but the
common and all preferred stocks will continue to remain outstanding. Subordinated
debt interest and principal payments will continue to be made." The conservatorship did
not directly appropriate any of the outstanding preferred or common stock in the
Company, and the terms of the Company's stock were not formally modified.

46.     Lockhart's announcement envisioned that the Company would eventually
be returned to profitability, and the conservatorship would be lifted. He made clear that
the conservatorship would be run with an eye toward attracting additional private
investment to the Company, noting that "some of the key regulations will be minimum
capital standards, prudential safety and soundness standards and portfolio limits."
According to Lockhart, the purpose of the new regulations was "so that any new investor
will understand the investment proposition."

47.     Edward DeMarco ("DeMarco"), the Acting Director of the FHFA,
confirmed this directive in testimony before the U.S. House of Representatives
Subcommittee on Capital Markets, Insurance, and Government-Sponsored Enterprises
on September 15, 2010. DeMarco testified that the "statutory purpose of
conservatorship is to preserve and conserve [Fannie Mae's] assets and put them in a
sound and solvent condition ... to help restore confidence in [Fannie Mae], enhance [its]
capacity to fulfill [its] mission, and [to] mitigate the systemic risk that contributed
directly to instability in the financial markets."

48.    HERA also authorized Treasury to strengthen Fannie Mae's balance sheet by purchasing its securities within set time limits and consistent with certain statutory requirements. Congress authorized Treasury to "purchase any obligations and other securities issued by the [Company] ... on such terms and conditions as the Secretary may determine and in such amounts as the Secretary may determine" during the time period from HERA's enactment in 2008 through the end of 2009. 12 U.S.C. §§ 1455(l)(1)(A), 1719(g)(1)(A). Before exercising that authority, HERA required the Treasury Secretary to determine that purchasing Fannie Mae's securities was "necessary to ... provide stability to the financial markets; prevent disruptions in the availability of mortgage finance; and protect the taxpayer." 12 U.S.C. §§ 1455(l)(1)(B), 1719(g)(1)(B).

49.    Pursuant to this temporary authority, Treasury Secretary Henry Paulson ("Paulson") announced that the Company had entered into a Preferred Stock Purchase Agreement ("PSPA") with Treasury under which it would receive a newly-issued series of preferred stock that was senior in priority to all other Fannie Mae stock ("Government Preferred Stock"). Paulson announced, "With this agreement, Treasury receives senior preferred equity shares and warrants that protect taxpayers. Additionally, under the terms of the agreement, common and preferred shareholders bear losses ahead of the new government preferred shares."

50.    In exchange, Fannie Mae was permitted to draw up to $100 billion from Treasury.[7] The Government Preferred Stock had a liquidation preference equal to $1 billion plus the sum of all draws by the Company against Treasury's funding

---

[7] In the First Amendment to the PSPA, Treasury and the FHFA agreed to expand this funding commitment to $200 billion in May 2009. In the Second Amendment to the PSPA, on December 24, 2009, Treasury and the FHFA agreed to a funding commitment that would be sufficient to enable the Company to satisfy its capitalization requirements for 2010, 2011, and 2012 and to a funding commitment in subsequent years up to a limit determined by an agreed-upon formula.

commitment and is entitled to a cumulative annual dividend equal to ten percent of the outstanding liquidation preference. The PSPA explicitly prohibits the payment of any dividend to any shareholder other than Treasury without Treasury's consent, and if the Company liquidates, Treasury must recover the full liquidation value of its shares before any other shareholder may recover anything. The PSPA also grants Treasury warrants to purchase up to 79.9% of the Company's common stock at a nominal price.

51.     According to a Treasury fact sheet, the agreement "provides significant protections for the taxpayer, in the form of senior preferred stock with a liquidation preference, an upfront $1 billion issuance of senior preferred stock with a 10% coupon from [Fannie Mae], quarterly dividend payments, warrants representing an ownership stake of 79.9% of [Fannie Mae] going forward, and a quarterly fee starting in 2010."

52.     Fannie Mae's agreement with Treasury expressly contemplated that the Government Preferred Stock would be redeemed at some future date, the agreement with Treasury would be terminated, and the Company would return to full private financing. According to Fannie Mae's Form 8-K, filed with the SEC on September 11, 2008, "If after termination of the [Treasury Department] Commitment, Fannie Mae pays down the liquidation preference of each outstanding share of Senior Preferred Stock in full, the shares will be deemed to have been redeemed as of the payment date."

### Fannie Mae's Debt Balloons Under the Conservatorship

53.     Subsequent to the conservatorship, Fannie Mae's debt to the Government increased precipitously. Under the terms of the Company's agreements with Treasury, any funds drawn from the Government were added to the original $1 billion face value of the Government Preferred Stock. These draws from the Government, increased

exponentially the amount Fannie Mae must pay the Government to redeem this stock and escape conservatorship.

54.     Likewise, the draws from the Government also increased what the Company owed in quarterly dividend payments. For example, on September 6, 2008, the Company drew $19 billion from Treasury, which increased the Government's preference by $19 billion and the Government's dividend by $1.9 billion (representing 10% of the $19 billion dollar draw). With increasing draws from the Government and increasing dividend payments to the Government, Fannie Mae's financial position worsened in the three years immediately after being placed in conservatorship.

55.     Under the direction of the FHFA, the Company expected to incur substantial loan losses in future years, preventing a return to profitability. Therefore, the Company booked substantial reserves, recorded loan losses before actually incurring them, and under applicable accounting standards, eliminated the value of non-cash deferred tax assets from its balance sheet.

56.     These impairments required the Company to draw increasing amounts against Treasury's funding commitment. Because of its depleted operating capital during this period, the Company sometimes lacked the funds necessary to pay Treasury its quarterly dividends under the PSPA, necessitating additional draws from Treasury to pay Treasury's own dividend. And these additional draws, in turn, increased the amount of Treasury's aggregate liquidation preference, and thus, the amount due in dividends to Treasury.

57.     As of February 29, 2012, prior to the Net Worth Sweep, Fannie Mae's debt to the Government had ballooned from the original $1 billion to $117.1 billion. This

amount represents the total outstanding liquidation preference on the Government Preferred Stock.

## Fannie Mae Returns to Profitability

58.     In 2012, as the housing market and the broader economy began to recover, Fannie Mae began to return to profitability again. After three years in conservatorship, it became clear that the Company's financial position was not as bad as had been feared. The Company's actual losses were far less than had been anticipated, and the assets that the Company had initially written down showed substantially increased value.

59.     On May 9, 2012, Fannie Mae filed its Form 10-Q with the SEC for the first quarter of 2012. It disclosed the Company's first quarterly profit since the imposition of the conservatorship, reflecting net quarterly income of $2.7 billion and positive net worth of $268 million (after its payment to Treasury of $2.8 billion in dividends). The Company also announced that as a result of its positive net worth, it would not request a draw from Treasury under the PSPA for the quarter.

60.     At the closing of the second quarter of 2012, the Company announced that it expected to be profitable for the foreseeable future. As a result, the Company would be able to remove the valuation allowance against its deferred tax assets—worth approximately $100 billion—in future years.

61.     After having been placed in conservatorship, Fannie Mae had declared massive non-cash losses, including write-downs of the value of tax assets and loss reserves. As of December 31, 2008, Fannie Mae had established combined loss reserves of $24.8 billion and written down tens of billions more in deferred tax assets. Yet by the close of the first quarter of 2013, it had become clear that these non-cash losses were

substantially overstated. The Company, as part of its earnings for that quarter, released $50.6 billion in deferred tax assets and loss reserves, and the Company is expected to release an additional $30 billion from these accounting reversals later this year.

62.     In 2012 and 2013, Fannie Mae's profits grew handsomely. The Company reported quarterly net income of $5.1 billion for the second quarter of 2012, $1.8 billion for the third quarter of 2012, $7.6 billion for the fourth quarter of 2012, $58.7 billion for the first quarter of 2013,[8] and $10.1 billion for the second quarter of $2013. Since the start of 2012 through the present, Fannie Mae has reported total net income of $86 billion.

63.     After a year and a half of profitability, Fannie Mae's balance sheet showed that the Company would soon be able to redeem all outstanding Government Preferred Stock, provide a financial return to private holders of junior preferred stock, pay dividends to holders of common stock, and even amass capital reserves.

64.     With Fannie Mae's return to profitability in early 2012, the Company's financial health and long-term outlook looked very favorable. Although Fannie Mae was still in conservatorship, the Company's rapidly growing profitability and net worth provided a roadmap to an exit from its Government debt and a return to fully private ownership and operation. The Company's newfound profits could also have benefited its private shareholders, with a return to dividends on both junior preferred and common stock, even after paying the Treasury its 10% annual dividend.

---

[8] Fannie Mae's extraordinary first quarter of 2013 reflected a $50.6 billion release of the valuation allowance on the Company deferred tax assets, as discussed *supra*. According to the Company's May 9, 2013 press release, these accounting adjustments were due to "[i]mprovement in Fannie Mae's financial results, the strong credit profile of the company's new book of business, and other factors." Without these adjustments, the Company's pre-tax income for the first quarter of 2013 was $8.1 billion.

65.     Even if Fannie Mae were wound down or liquidated, the Company's profitability reflected the value of its underlying assets. Any reasonable liquidation would have generated more than enough value to pay off all outstanding Government Preferred Stock, while still allowing for the Company to provide value to its junior preferred and common shareholders.

## Treasury and FHFA Execute the Net Worth Sweep

66.     On August 17, 2012, the Company's optimistic, favorable outlook abruptly ended with the announcement by the Government that it was unilaterally amending the terms of its agreements with Fannie Mae, effective January 1, 2013. The change was devastating. Instead of taking steps to aid in Fannie Mae's return to profitability and exit from conservatorship, Treasury and the FHFA together entered into the Third Amendment to the PSPA ("Third Amendment" or "Net Worth Sweep"). The Third Amendment ensured that Treasury would be the sole beneficiary of Fannie Mae's newfound profitability and laid the groundwork for the Company to be wound down.

67.     Under the terms of the Net Worth Sweep, rather than paying Treasury a 10% annual dividend on its Government Preferred Stock, Fannie would now be required to pay every dollar of their entire quarterly net worth, above a nominal, temporary capital reserve, to Treasury as a dividend.[9] In a press release announcing the change, the Treasury Department summarized the new policy as a "Full Income Sweep of All Future Fannie Mae and Freddie Mac Earnings to Benefit Taxpayers." In Treasury's own words,

---

[9] The capital reserve amount starts at $3 billion and steadily decreases by $600 million each year until it is eliminated on January 1, 2018. Under the Net Worth Sweep, the Company's net worth is defined as the amount by which its total assets (excluding Treasury's funding commitment and any unfunded amounts related to the commitment) exceed its total liabilities (excluding any obligation in respect of capital stock), as reflected on the Company's balance sheet with generally accepted accounting principles.

the Government would now take "a quarterly sweep of every dollar of profit that [Fannie Mae] earns going forward."[10]

68.    Under the Net Worth Sweep, any increase in the net worth of Fannie Mae flowing from net income or other comprehensive income will automatically be swept to Treasury in its entirety, no matter how large that increase in net worth is or how much it exceeds the 10% dividend provided for in the original PSPA. Furthermore, this new net-worth dividend must be paid to Treasury in cash, even though the net worth of the Company may include non-cash assets, e.g., the deferred tax assets. As a result, Fannie Mae has had to sell non-liquid assets or issue additional debt to pay the net-worth dividend. This requirement has prevented the Company from maximizing the value of its assets.

69.    The Net Worth Sweep has also prevented Fannie Mae from accumulating any capital, redeeming the Government Preferred Stock, paying a dividend to its junior preferred shareholders, paying a dividend to its common shareholders, investing in its business, or retaining any profits. And since the Net Worth Sweep, under Treasury's new rules, applies to all new net worth *in perpetuity*, Fannie Mae will *never* be able to do any of these things. Essentially, Treasury and the FHFA have forever converted Fannie Mae's entire net worth into a magic Government piggy bank. So long as Fannie Mae remains in operation, all of its net worth will be transferred to Treasury, but the outstanding account balance will always remain at $117.1 billion. Under the Net Worth

---

[10] *See* Press Release, Treasury, Treasury Department Announces Further Steps To Expedite Wind Down Of Fannie Mae And Freddie Mac (Aug. 17, 2012), *available at* http://www.treasury.gov/press-center/ press- releases/Pages/tg1684.aspx.

Sweep, not a single dollar of Fannie Mae's value can be used for anything but to pay its Government dividend—not even to pay down its own debt to Treasury.

70.    The Government's purpose in imposing the Net Worth Sweep was remarkably transparent. Treasury openly announced that one of the objectives for the Net Worth Sweep was "[m]aking sure that every dollar of earnings that Fannie Mae ... generates[s] will be used to benefit taxpayers for their investment in those firms." In other words, the purpose was not to put the Company on sound financial footing or conserve its assets—but rather to use the Company's assets to benefit taxpayers.

71.    Another justification for the Net Worth Sweep was to wind down Fannie Mae as a private company. Treasury explained that the Net Worth Sweep was designed to fulfill "the commitment made in the Administration's 2011 White Paper that the GSEs will be wound down and will not be allowed to retain profits, rebuild capital, and return to the market in their prior form." In another press release, Treasury noted that the Net Worth Sweep would "help expedite the wind down of Fannie Mae" and "support the continued flow of mortgage credit during a responsible transition to a reformed Housing market."

72.    As *Fortune Magazine's* Term Sheet blog explained:[11]

> Why did the Treasury enact the so-called Third Amendment that so
> radically altered the preferred-stock agreement? By mid-2012, Fannie and
> Freddie were beginning to generate what would become gigantic earnings
> as the housing market rebounded. If the original agreement remained in
> place, the GSEs would build far more than $100 billion in retained
> earnings, and hence fresh capital, in 2013 alone. That would exert pressure
> for Congress to allow Fannie and Freddie to pay back the government in
> full, and reemerge as private players. [Treasury Secretary] Timothy
> Geithner was strongly opposed to the rebirth of the old Fannie and

---

[11] Shawn Tully, *What's Behind Perry Capital's Fannie and Freddie Gambit*, CNN MONEY: A SERVICE OF CNN, FORTUNE, AND MONEY, Jul. 8, 2013, *available at* http://finance.fortune.cnn.com/2013/07/08/whats-behind-perry-capitals-fannie-freddie-gambit/.

Freddie. The "sweep clause" that grabbed the entire windfall in profits was specifically designed to ensure that Fannie and Freddie remained wards of the state that would eventually be liquidated.

73.     Indeed, in remarks in Phoenix, AZ on August 6, 2013, President Barack Obama ("President Obama") announced that his Administration would follow through on its promises to wind down Fannie Mae. President Obama explained, "So the good news is, right now there's a bipartisan group of senators working to end Fannie and Freddie as we know them. And I support these kinds of reform efforts." Following President Obama's remarks, the White House Office of the Press Secretary released a fact sheet providing additional details on the Administration's plan for Fannie Mae. Among the "Core Principles," the fact sheet listed, "End Fannie Mae and Freddie Mac's failed business model so taxpayers are never again on the hook for bad loans and bailouts." The fact sheet further explained:

> Fannie Mae and Freddie Mac should be wound down through a responsible transition, and the government role during normal times should be no bigger than necessary to achieve the principles laid out here. One of the failures of the old Fannie Mae and Freddie Mac model is that shareholders and senior managers benefitted from implicit guarantees while taxpayers were on the hook.

74.     Yet, in reality, it is taxpayers that are reaping the benefits of the Government's conservatorship of Fannie Mae, and it is the Company that has lost billions in economic value. The dividends that are being paid to Treasury have resulted in a torrent of cash to the Government—and will continue to do so. In 2012, Fannie Mae earned profits of approximately $17.2 billion, and in just the first half of 2013, the Company earned profits of approximately $68.8 billion. This includes over $50 billion in recaptured tax assets the Company had written off in prior years, and Fannie Mae is expected to recognize an additional $30 billion in income from deferred tax benefits in

the near future. Moreover, since the imposition of the Net Worth Sweep, Fannie Mae

will have paid the Government an additional $63.8 billion over and above what the

Company was obligated to pay in dividends under its original agreement. These

payments under the Net Worth Sweep represent an extraordinary windfall for the U.S.

Treasury for which Fannie Mae received no consideration at all.

75.     While these payments from Fannie Mae to Treasury were enormous, they

were not unexpected. According to a report issued by the FHFA's Inspector General

("IG"), the IG noted that the Net Worth Sweep could result in "an extraordinary

payment to Treasury."[12] And they have profoundly benefited the Government. According

to a report published by *Politico*, "A Treasury Department official confirmed that the

funds returned by [Fannie Mae] will be deposited into the general fund and will be

factored into how long the department can continue to pay the government's bills before

running up against the debt ceiling."[13] *Politico* further explained that according to the

Bipartisan Policy Center, Fannie Mae's nearly $60 billion dollar dividend payment from

the first quarter of 2013 "would likely push back the date when the government will

breach the debt ceiling until October, if it is not raised before then."

76.     Treasury now expects to recoup every dollar of the $117.1 billion it infused

into Fannie Mae, with interest, in the next year. And over the next decade, Treasury

expects to collect tens of billions of dollars in additional windfall profits.

---

[12] *See* FHFA Office of Inspector General, *Analysis of the 2012 Amendments to the Government Stock Purchase Agreements*, at 15 (Mar. 20, 2013).

[13] *See* Jon Prior, *Fannie Mae's Big Payoff: $59B Sent to Feds*, POLITICO, May 9, 2013, *available at* http://www.politico.com/story/2013/05/fannie-mae-to-send-treasury-big-payday-91128.html.

**The Net Worth Sweep Is an Unlawful Taking of the
Company's Private Property Without Just Compensation**

77.     Before the imposition of the conservatorship, Fannie Mae operated as a
fully private company, which secured capital from private investors, was traded on a
public stock exchange, and was organized to maximize shareholder value. It had a
positive net worth in the billions of dollars. While the conservatorship provided the
Government with certain limited rights, governed by statute, and the original PSPA
provided the Company with an infusion of cash, it left Fannie Mae's fundamental
structure as a private corporation in place.

78.     Under HERA, the FHFA's limited role as Conservator was to operate
Fannie Mae so as to render it "sound and solvent" and to "conserve [its] assets and
property" with the goal of returning the Company to financial health. Unlike
receivership, which is designed to wind down or liquidate a company, the
conservatorship was statutorily limited to returning Fannie Mae to solvency so that it
could eventually return to fully private control. But instead of attempting to rehabilitate
Fannie Mae in good faith, the Conservator raided the Company's assets for use by
taxpayers.

79.     The Government's actions culminated in the Net Worth Sweep, which
requires Fannie Mae to provide the United States with "every dollar of earnings" from
the Company in perpetuity. As explained *supra*, while the Net Worth Sweep must be
paid in cash, it includes both cash and non-cash assets, including deferred tax assets.
Taken as a whole, it entirely deprives Fannie Mae of all of its reasonable value for as
long as the Company remains in business.

80.    For all intents and purposes, the Government's Net Worth Sweep is indistinguishable from simply "taking" the Company outright. By taking "every dollar of earnings" of Fannie Mae in perpetuity, the Government has effectively nationalized the Company, albeit without the attendant stigma of such a brazen act. Were the Government to simply "take" a private company for public use, the Fifth Amendment would mandate the payment of "just compensation." Likewise, when the effect of Government action is the total deprivation of all reasonable economic value of the property, a taking also exists, and "just compensation" must be paid.

81.    As a direct result of the Government's imposition of the the Net Worth Sweep, Fannie Mae has no reasonable economic value. By the Net Worth Sweep's express terms, Fannie Mae cannot have net worth. It cannot accumulate any capital, invest in its business, or retain profits. It cannot take any actions that would benefit its private shareholders, such as paying a dividend to its preferred or common stockholders. And since the Net Worth Sweep applies now and forever, Fannie Mae's predicament is permanent; it will *never* have any reasonable economic value.

82.    Fannie Mae's economic value was taken, not to make the Company "sound and solvent" or "conserve [its] assets and property," but rather for the public use of taxpayers. As Treasury has admitted on numerous occasions, its plan is to unwind the Company and maximize its return not for the Company or its shareholders but for the Government treasury. And it has generated massive new revenues for that purpose. By September 30, 2013, Fannie Mae will have paid $105 billion in dividends to taxpayers, and it is on track to transfer billions more. Fannie Mae's website, now operated by the Government, even boasts of its enormous payments to taxpayers in a banner headline

on its homepage.[14] As Guggenheim Partners analyst Jaret Seiberg wrote in a note to clients, "Washington could quickly get addicted to the revenue from Fannie and Freddie." Indeed, it may already be highly dependent.

83.     While the Government has collected over a hundred billion dollars in dividend payments from Fannie Mae—and is on track to collect billions more—the Company has never been provided with just compensation for the loss of its entire economic value. Indeed, it has not been provided with any compensation at all. Therefore, the Government's Net Worth Sweep constitutes an unlawful taking without just compensation in violation of the Fifth Amendment to the U.S. Constitution.

## DERIVATIVE AND DEMAND FUTILITY ALLEGATIONS

### Demand on Fannie Mae's Board Would Be Futile and Is Excused

84.     Demand on Fannie Mae's Board to institute this litigation would be futile and is excused. Because the Conservator has assumed all of the powers of the Board, there are no independent directors who could consider a pre-suit demand.

85.     As reported in the Company's public filings, on September 6, 2008, at the request of the Secretary of the Treasury, the Chairman of the Board of Governors of the Federal Reserve, and the Director of FHFA, Fannie Mae's Board adopted a resolution consenting to the Company's placement into conservatorship. The Director of FHFA then appointed the FHFA as Fannie Mae's Conservator on September 6, 2008, in accordance with the Regulatory Reform Act and the Federal Housing Enterprises Financial Safety and Soundness Act.

---

[14] *See* Fannie Mae, http://www.fanniemae.com.

86.     As confirmed by the Company's public filings, upon its appointment, the

Conservator "immediately succeeded to all rights, titles, powers and privileges of Fannie

Mae, and of any ... director of Fannie Mae with respect to Fannie Mae and its assets, and

succeeded to the title to all books, records and assets held by any other legal custodian

or third party [of Fannie Mae]. The conservator has the power to take over [Fannie

Mae's] assets and to operate [Fannie Mae's] business ... and to conduct all business of

the company." FHFA, in its role as Conservator, has overall management authority over

Fannie Mae's business.

87.     FHFA Director Lockhart stated on September 7, 2008, in announcing the

appointment of FHFA as Conservator of Fannie Mae, that "FHFA will assume the power

of the Board and management." Accordingly, Fannie Mae's Board no longer has the

power or duty to manage, direct, or oversee the business and affairs of the Company,

including whether to initiate a lawsuit for the taking of Fannie Mae's property by the

Government.

88.     Even if Fannie Mae's directors did have the power to initiate this action,

which they clearly do not, Fannie Mae's directors, and each of them individually, lack

the necessary independence to do so. All of the directors of Fannie Mae were appointed

by, and thereby are beholden to and controlled by, the Conservator. As the Company

reported in its Form 8-K filing with the SEC on December 24, 2008, FHFA, as

Conservator, reconstituted Fannie Mae's Board by handpicking and appointing Fannie

Mae's directors. The FHFA also directs the function and authorities of the Board.

89.     Fannie Mae's Code of Conduct and Conflicts of Interest Policy for

Members of the Board ("Code of Conduct") further confirms that Fannie Mae's directors

are entirely beholden to the Conservator and lack the independence necessary to

consider a pre-suit demand. Fannie Mae's Code of Conduct states, in relevant part:

> For as long as the Corporation remains under the conservatorship, the
> directors of the Corporation shall serve on behalf of the Conservator and
> shall be required to exercise authority as directed by and with the
> approval, where required, of the Conservator and shall have no duties to
> any person or entity except to the Conservator. Accordingly, the directors
> are not obligated to consider the interests of the Corporation, the holders
> of the Corporation's equity or debt securities or the holders of the
> Corporation's mortgage-backed securities, unless specifically directed to
> do so by the Conservator.

90.   Both Fannie Mae's public filings with the SEC and its by-laws confirm that

the Board has no independent power separate from the Conservator. According to

Fannie Mae's 2011 and 2012 10-K statements, "Our directors serve on behalf of the

conservator and exercise authority as directed by and with the approval, where required,

of the conservator. Our directors do not have any duties to any person or entity except

the conservator. Accordingly, our directors are not obligated to consider the interests of

the company ... unless specifically directed to do so by the conservator."

91.   Additionally, the 10-Ks acknowledge that the Conservator has "directed

the Board to consult with and obtain the approval of the conservator" before taking

action in specific areas, including: actions involving capital stock; dividends; the Stock

Purchase Agreement; increases in risk limits; material changes in accounting policy and

reasonably foreseeable material increases in operational risk; matters that relate to the

conservatorship; and any action that in the reasonable business judgment of the Board

at the time that is likely to cause significant reputational risk.

92.    Likewise, the Company's by-laws confirm, "The Board serves on behalf of the conservator and shall exercise their authority as directed by the conservator." Therefore, demand on the Board would be futile and is excused.

### Demand on the Conservator Would Be Futile and Is Excused

93.    To the extent that demand would, or should, be made on the Conservator itself, such demand also would be futile because the Conservator has manifest, disabling, and irreconcilable conflicts of interest with respect to this action and lacks the independence necessary to consider a pre-suit demand.

94.    It would be impractical, if not absurd, for the FHFA, an agency of the United States government, to sue the United States government, alleging claims based on both the Treasury Department's—and its own—actions. The FHFA, as a party to the Net Worth Sweep that is the heart of this action, would, in essence, be challenging the very illegal actions in which it participated.

95.    As an agency of the federal government, the FHFA is interested in and benefits from the Net Worth Sweep and cannot reasonably be expected to initiate litigation for the 5th Amendment takings claims alleged herein. Notwithstanding its fiduciary duties to Fannie Mae and its stockholders, the FHFA has expressly acknowledged that it does not act with the interests of Fannie Mae shareholders in mind. Indeed, in the Company's 2008 10-K, it frankly disclosed that, since the imposition of the conservatorship, it was "[n]o longer managed with a strategy to maximize common shareholder returns."

96.    Moreover, any takings action initiated by the FHFA against the United States would necessarily implicate not only itself but also the U.S. Department of

Treasury. Yet, as explained *infra*, Treasury exercises *de facto* control over the actions of the FHFA, further exposing the Conservator's manifest conflict of interest.

97.    The Treasury Department is a closely-related sister federal agency that has acted in concert with the FHFA and Fannie Mae throughout the conservatorship. Together, the FHFA and Treasury placed Fannie Mae in conservatorship; established the preferred stock purchase agreement between Treasury and Fannie Mae and then amended the PSPA four times, including the Net Worth Sweep; established a new secured lending credit facility available to Fannie Mae; and initiated a new program to purchase the mortgage-backed securities of Fannie Mae. Furthermore, the Secretary of the Treasury occupies one of the four reserved seats on the Federal Housing Oversight Board ("FHOB"), which is statutorily required to "advise the Director [of FHFA] with respect to overall strategies and policies in carrying out the duties of the Director under [HERA]." 12 U.S.C. § 4513a.

98.    It is the Treasury Department's actions, together with the FHFA, which comprise the heart of this action. The Net Worth Sweep was instituted through an agreement between the FHFA and Treasury, and both the FHFA and Treasury directly reap the benefits of this incestuous relationship to the detriment of the Company. These close and disabling ties between the FHFA and Treasury prevent the FHFA from exercising independent judgment. In fact, without the close and disabling ties between Treasury and the FHFA, the unlawful conduct complained of herein may have never occurred in the first instance.

99.    The FHFA is statutorily required to operate Fannie Mae so as to render it "sound and solvent" and to "conserve [its] assets and property." Yet despite that

mandate, the FHFA entered into a self-dealing pact with Treasury to provide the United States with "every dollar of earnings" from the Company in perpetuity. That fact alone exposes the fiction that these two federal government agencies acted separately or that the FHFA's actions are not motivated by its conflicted relationship with Treasury. As a practical matter, any entity that has so capitulated to Treasury that it allows Treasury to execute a "Net Worth Sweep" of all its earnings in perpetuity cannot reasonably be expected to sue that same entity alleging its own capitulation was unlawful.

100.    In reality, the Conservator is no longer managing Fannie Mae for the benefit of the Company or its shareholders but rather for the benefit of taxpayers. On March 4, 2013, FHFA Acting Director DeMarco delivered remarks to the National Association for Business Economics's annual policy conference, entitled "FHFA's Conservatorship Principles for 2013." DeMarco explained, "FHFA has reported on numerous occasions that, with taxpayers providing capital supporting [Fannie Mae's] operations, this 'preserve and conserve' mandate directs FHFA to minimize losses on behalf of taxpayers." Instead of "preserving and conserving" the assets of Fannie Mae for the Company and its shareholders, as mandated by statute, DeMarco unmasked the FHFA's—and the Treasury Department's—real directive: to "preserve and conserve" the private assets of Fannie Mae for public use by taxpayers.

101.    Under these circumstances, the FHFA, as a federal government agency at the heart of the unlawful conduct, cannot be expected to objectively pursue a lawsuit against the United States, necessarily including both itself and the actions of the Treasury Department with which it conspired. As a result of these manifest, disabling, and irreconcilable conflicts of interest, the Conservator is incapable of pursuing a

derivative claim for an unlawful taking on behalf of the Company against the United States. Therefore, to the extent demand would, or should, be made on the Conservator, such demand would be futile and is excused.

### CLAIMS FOR RELIEF

### Unlawful Taking Without Just Compensation
### Under the Fifth Amendment to U.S. Constitution

102.    Plaintiffs incorporate by reference and reallege each and every allegation of the preceding paragraphs, as though fully set forth herein.

103.    The Fifth Amendment to the United States Constitution provides that no person shall "be deprived of life liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation."

104.    By imposing the Net Worth Sweep, which in Treasury's own words was designed to take "every dollar of earnings [Fannie Mae] generates ... to benefit taxpayers," the Government took all reasonable value of the Company for public use.

105.    When the Government takes private property for a public use or a public purpose, the Fifth Amendment requires the payment of "just compensation."

106.    The Government did not pay just compensation to Fannie Mae for its taking of the entire net worth of the Company. As a result, Fannie Mae was injured and is entitled to just compensation in a sum equal to the amounts taken by the Government through its unlawful imposition of the Net Worth Sweep.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiffs, on behalf of Fannie Mae, demand judgment against the United States of America as follows:

A. Finding that the United States has unlawfully taken the private property of Fannie Mae for public use without just compensation in violation of the Takings Clause of the Fifth Amendment to the U.S. Constitution;

B. Determining and awarding Fannie Mae just compensation for the Government's taking of its property;

C. Awarding Plaintiffs the costs and disbursements of the action, including reasonable attorneys' fees, experts' fees, costs, and other expenses; and

D. Granting such other and further relief as the Court deems just and proper.

DATED: August 23, 2013                    **SCHUBERT JONCKHEER & KOLBE LLP**

                                          BY: _____
                                                    NOAH M. SCHUBERT

                                          Noah M. Schubert
                                          Attorney of Record
                                          *nschubert@schubertlawfirm.com*

                                          Three Embarcadero Ctr Ste 1650
                                          San Francisco, CA 94111-4018
                                          Ph: 415-788-4220
                                          Fx: 415-788-0161

OF COUNSEL:                               **SCHUBERT JONCKHEER & KOLBE LLP**

                                          Robert C. Schubert
                                          *rschubert@schubertlawfirm.com*

                                          Miranda P. Kolbe
                                          *mkolbe@schubertlawfirm.com*

                                          Three Embarcadero Ctr Ste 1650
                                          San Francisco, CA 94111-4018
                                          Ph: 415-788-4220
                                          Fx: 415-788-0161


                                          **SHAPIRO HABER & URMY LLP**

                                          Edward F. Haber
                                          *ehaber@shulaw.com*

                                          53 State Street
                                          Boston, MA 02109
                                          Ph: 617-439-3939
                                          Fx: 617-439-0134

                                          *Attorneys for Plaintiffs*

## VERIFICATION

I, **Bryndon Fisher**, hereby verify and declare under penalty of perjury that I have reviewed the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel.

DATED: 8/22/2013

_____
BRYNDON FISHER

I, **Bruce Reid**, hereby verify and declare under penalty of perjury that I have reviewed the Verified Shareholder Derivative Complaint, know the contents thereof, and authorize its filing. The foregoing is true and correct to the best of my knowledge, information, and belief, based on investigation of counsel.

DATED: 8/22/2013

_____
BRUCE REID