No. 13-608C
(Judge Sweeney)

---

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

---

BRYNDON FISHER, *et al*.,

Plaintiffs,

v.

THE UNITED STATES,

Defendant.

---

**DEFENDANT'S MOTION TO DISMISS**

---

|  |  |
|---|---|
|  | STUART F. DELERY<br>Assistant Attorney General |
|  | JEANNE E. DAVIDSON<br>Director |
| OF COUNSEL: |  |
| PETER A. BIEGER<br>Assistant General Counsel<br>KATHERINE M. BRANDES<br>Attorney Advisor<br>Department of the Treasury<br>1500 Pennsylvania Avenue, N.W<br>Washington, D.C. 20220 | KENNETH M. DINTZER<br>Acting Deputy Director<br>ELIZABETH M. HOSFORD<br>GREGG M. SCHWIND<br>Senior Trial Counsel<br>KATY M. BARTELMA<br>SETH W. GREENE<br>ERIC E. LAUFGRABEN<br>DANIEL B. VOLK<br>Trial Attorneys<br>Commercial Litigation Branch<br>Civil Division<br>Department of Justice<br>P.O. Box 480<br>Ben Franklin Station<br>Washington, D.C. 20044<br>(202) 616-0385<br>kenneth.dintzer@usdoj.gov |
| January 23, 2014 | Attorneys for Defendant |

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ..................................................................................... iv

INTRODUCTION ................................................................................................... 1

STATEMENT OF FACTS ...................................................................................... 4

    I.      History Of Fannie Mae ...................................................................... 4

    II.     The Housing And Economic Recovery Act Of 2008 ........................... 5

    III.    The Government's Rescue Of Fannie Mae............................................ 6

    IV.    Plaintiffs' Suit In This Court.............................................................. 7

ARGUMENT .......................................................................................................... 8

    I.      Standards Of Review ......................................................................... 8

    II.     Under HERA, Shareholders Lack Standing To Bring A Derivative
           Suit On Behalf Of Fannie Mae ......................................................... 9

    III.    There Is No Basis To Excuse Plaintiffs' Failure To Make A
           Demand Of FHFA............................................................................ 12

           A.     This Derivative Complaint Should Be Dismissed Because
                    Plaintiffs Failed To Make A Pre-Suit Demand........................ 12

           B.     Plaintiffs' Failure To Make Demand Cannot Be Excused....................... 14

                1.     Legal Framework For Demand Futility ........................................ 14

                2.     Plaintiffs Fail To Allege Specific Facts Necessary
                      To Meet The Exacting Pleading Requirements For
                      Demand Futility ........................................................................ 16

    IV.    The Court Lacks Jurisdiction Over Plaintiffs' Complaint ................................... 20

           A.     The Complaint Challenges Actions Of The Conservator,
                    But FHFA Is Not The United States When It Acts As
                    Conservator ............................................................................. 20

                1.     The Tucker Act Grants The Court of Federal Claims
                      Jurisdiction Over Claims Against The United States .................. 21

                  2.     For Purposes Of The Tucker Act, FHFA Is Not The
                      United States When Acting As Conservator For
                      Fannie Mae............................................................................... 21

B.    The Court Lacks Jurisdiction To Entertain Plaintiffs' Challenge To FHFA's Discretion As Conservator ................................... 24

V.    Plaintiffs Fail To State A Viable Takings Claim .................................................. 26

A.    Plaintiffs Have Not Identified A Legally Cognizable Property Interest Of Fannie Mae's That Could Have Been Taken In These Circumstances ............................................................... 26

B.    Plaintiffs Have Not Alleged The Facts Necessary For A Taking ...................................................................................................... 29

1.    Plaintiffs Cannot Plausibly Allege A Categorical Regulatory Taking ...................................................... 30

2.    Plaintiffs Cannot Establish A *Penn Central* Regulatory Taking ...................................................... 31

C.    Treasury Cannot Be Subject To Takings Liability Because The Third Amendment Was Executed By The Government As A Market Participant Rather Than As The Sovereign ........................ 33

1.    Courts Distinguish Between Sovereign And Proprietary Acts ................................................................. 34

2.    Plaintiffs' Takings Claims Against Treasury Are Based Solely On Proprietary Acts ................................................ 35

VI.   Plaintiffs' Claims Are Not Ripe For Judicial Review ......................................... 36

CONCLUSION ................................................................................................................... 39

## <u>TABLE OF AUTHORITIES</u>

### <u>CASES</u>

*767 Third Ave. Assocs. v. United States*,
   48 F.3d 1575 (Fed. Cir. 1995)............................................................................... 22

*Abbott Labs. v. Gardner*,
   387 U.S. 136 (1967)........................................................................................... 37

*Acceptance Ins. Cos., Inc. v. United States*,
   583 F.3d 849 (Fed. Cir. 2009).................................................................... 8, 27, 28

*Adams v. United States*,
   20 Cl. Ct. 132 (1990) ......................................................................................... 25

*Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*,
   988 F.2d 1157 (Fed. Cir. 1993).............................................................................. 9

*Aetna Life Ins. Co. v. Haworth*,
   300 U.S. 227 (1937)........................................................................................... 36

*AG Route Seven P'ship v. United States*,
   57 Fed. Cl. 521 (2003) ....................................................................................... 23

*Alaska Airlines v. Johnson*,
   8 F.3d 791 (Fed. Cir. 1993)............................................................................ 33, 35

*Alves v. United States*,
   133 F.3d 1454 (Fed. Cir. 1998)............................................................................ 22

*Am. Cont'l Corp. v. United States*,
   22 Cl. Ct. 692 (1991) ............................................................................... 27, 32, 33

*Am. Pelagic Fishing Co, L.P. v. United States*,
   379 F.3d 1363 (Fed. Cir. 2004)....................................................................... 26, 27

*Ambase Corp. v. United States*,
   61 Fed. Cl. 794 (2004) ....................................................................................... 23

*Ameristar Fin. Servicing, Co. v. United States*,
   75 Fed. Cl. 807 (2007) ............................................................................. 21, 22, 23

*Aronson v. Lewis*,
   473 A.2d 805 (Del. 1984) ................................................................................... 15

*Ashcroft v. Iqbal*,
  556 U.S. 662 (2009) ......................................................................... 8, 9

*Bair v. United States*,
  515 F.3d 1323 (Fed. Cir. 2008) ................................................... 27, 28

*Beekwilder v. United States*,
  55 Fed. Cl. 54 (2002) ................................................................... 37, 38

*Bell Atl. Corp. v. Twombly*,
  550 U.S. 544 (2007) ............................................................................ 8

*Branch Banking & Trust Co. v. United States*,
  98 F. Supp. 757 (Ct. Cl. 1951) ......................................................... 34

*Branch v. United States*,
  69 F.3d 1571 (Fed. Cir. 1995) .......................................... 27, 30, 33

*Brehm v. Eisner*,
  746 A.2d 244 (Del. 2000) ........................................................... 15, 17

*Brown v. United States*,
  105 F.3d 621 (Fed. Cir. 1997) ...................................................... 21, 26

*Buckley v. Valeo*,
  424 U.S. 1 (1976) ............................................................................. 36

*Cal. Hous. Sec., Inc. v. United States*,
  959 F.2d 955 (Fed. Cir. 1992) ................................................... passim

*Cienega Gardens v. United States*,
  331 F.3d 1319 (Fed. Cir. 2003) ....................................................... 31

*Commonwealth Edison Co. v. United States*,
  56 Fed. Cl. 652 (2003) ................................................................. 36, 38

*Cox v. Kurt's Marine Diesel of Tampa, Inc.*,
  785 F.2d 935 (11th Cir. 1986) ......................................................... 34

*Daily Income Fund, Inc. v. Fox*,
  464 U.S. 523 (1984) ..................................................................... 12, 13

*De-Tom Enters., Inc. v. United States*,
  552 F.2d 337 (Ct. Cl. 1977) ............................................................. 26

*Esther Sadowsky Testamentary Trust v. Syron*,
  639 F. Supp. 2d 347 (S.D.N.Y. 2009) ............................................................ 10, 11

*First Hartford Corp. Pension Plan & Trust v. United States*,
  194 F.3d 1279 (Fed. Cir. 1999) ................................................................................ 9

*Franklin Savings Corp. v. United States*,
  46 Fed. Cl. 533 (2000) ............................................................................................ 25

*Gaubert v. Fed. Home Loan Bank Bd.*,
  863 F.2d 59 (D.C. Cir. 1988) ................................................................................ 16

*Golden Pac. Bancorp v. United States*,
  15 F.3d 1066 (Fed. Cir. 1994) ...................................................................... passim

*Golden Pac. Bancorp v. United States*,
  25 Cl. Ct. 768 (1992), ...................................................................................... 24, 25

*Hawes v. City of Oakland*,
  104 U.S. 450 (1881) .......................................................................................... 12, 13

*Hawkeye Commodity Promotions, Inc. v. Vilsack*,
  486 F.3d 430 (8th Cir. 2007) ................................................................................ 30

*Herron v. Fannie Mae*,
  857 F. Supp. 2d 87 (D.D.C. 2012) .................................................................. 21, 22

*Huntleigh USA Corp. v. United States*,
  525 F.3d 1370 (Fed. Cir. 2008) ............................................................................ 26

*I.M. Frazer v. United States*,
  288 F.3d 1347 (Fed. Cir. 2002) ............................................................................ 23

*In re Citigroup Inc. S'holder Derivative Litig.*,
  964 A.2d 106 (Del. Ch. 2009) .............................................................................. 17

*In re Fed. Home Loan Mortg. Corp. Derivative Litig.*,
  643 F. Supp. 2d 790 (E.D. Va. 2009), .............................................................. 9, 11

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
  503 F. Supp. 2d 9 (D.D.C. 2007) ...................................................................... 15, 16

*In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*,
  629 F. Supp. 2d 1 (D.D.C. 2009) ...................................................................... 10, 11

*In re Intel Corp. Derivative Litig.*,
    621 F. Supp. 2d 165 (D. Del. 2009)................................................................ 15, 17

*In re Walt Disney Co. Derivative Litig.*,
    825 A.2d 275 (Del. Ch. 2003)................................................................ 16

*Indium Corp. of Am. v. Semi-Alloys, Inc.*,
    781 F.2d 879 (Fed. Cir. 1985)................................................................ 8

*Kamen v. Kemper Fin. Servs., Inc.*,
    500 U.S. 90 (1991)................................................................ 14

*Kanter v. Barella*,
    489 F.3d 170 (3d Cir. 2007)................................................................ 17

*Kaplan v. Peat, Marwick, Mitchell & Co.*,
    540 A.2d 726 (Del. 1988) ................................................................ 13

*Kellmer v. Raines*,
    674 F.3d 848 (D.C. Cir. 2012)................................................................ 9, 10, 11

*Landmark Land Co. v. F.D.I.C.*,
    256 F.3d 1365 (Fed. Cir. 2001)................................................................ 18

*Landy v. F.D.I.C.*,
    486 F.2d 139 (3d Cir. 1973)................................................................ passim

*Leon Cnty., Fla. v. Fed. Hous. Fin. Agency*,
    816 F. Supp. 2d 1205 (N.D. Fla. 2011),................................................................ 18

*Lewis v. Graves*,
    701 F.2d 245 (2d Cir. 1983)................................................................ 17, 18

*Lingle v. Chevron U.S.A. Inc.*,
    544 U.S. 528 (2005)................................................................ 34

*Loretto v. Teleprompter Manhattan CATV Corp.*,
    458 U.S. 419 (1982)................................................................ 29

*La. Mun. Police Emps. Ret. Sys.*,
    434 F. App'x at 191 (4th Cir. 2011) ................................................................ 9, 11

*Lucas v. S.C. Coastal Council*,
    505 U.S. 1003 (1992)................................................................ 29, 30

*Lujan v. Defenders of Wildlife*,
  504 U.S. 555 (1992) ............................................................................................. 9

*M & J Coal Co. v. United States*,
  47 F.3d 1148 (Fed Cir. 1995) ............................................................................ 27

*Maritrans, Inc. v. United States*,
  342 F.3d 1344 (Fed. Cir. 2003) ............................................................ 28, 37, 38

*Mass. Bay Transp. Auth. v. United States*,
  21 Cl. Ct. 252 (1990) ..................................................................................... 36, 38

*Matthews v. United States*,
  72 Fed. Cl. 274 (2006) ........................................................................................... 8

*Norman v. United States*,
  429 F.3d 1081 (Fed. Cir. 2005) ......................................................................... 23

*O'Melveny & Myers v. F.D.I.C.*,
  512 U.S. 79 (1994) .......................................................................................... 21, 23

*Pa. Coal Co. v. Mahon*,
  260 U.S. 393 (1922) .............................................................................................. 29

*Pareto v. F.D.I.C.*,
  139 F.3d 696 (9th Cir. 1998) ............................................................................. 11

*Parsons v. United States*,
  670 F.2d 164 (Ct. Cl. 1982) ............................................................................... 18

*Penn Central Transportation Co. v. City of New York*,
  438 U.S. 104 (1978) .............................................................................................. 31

*PIN/NIP, Inc. v. Platte Chem. Co.*,
  304 F.3d 1235 (Fed. Cir. 2002) ............................................................................ 8

*Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v.*
  *Raines*,
  534 F.3d 779 (D.C. Cir. 2008) ........................................................................... 14

*Rales v. Blasband*,
  634 A.2d 927 (Del. 1993) .................................................................................... 15

*Res. Invs., Inc. v. United States*,
  85 Fed. Cl. 447 (2009) ......................................................................................... 31

*Rick's Mushroom Serv., Inc. v. United States,*
    521 F.3d 1338 (Fed. Cir. 2008) ................................................................................ 26

*Rose Acre Farms, Inc. v. United States,*
    559 F.3d 1260 (Fed. Cir. 2009) ................................................................................ 33

*Ruckelshaus v. Monsanto Co.,*
    467 U.S. 986 (1984) ................................................................................................... 34

*Rutman Wine Co. v. E. & J. Gallo Winery,*
    829 F.2d 729 (9th Cir. 1987) ...................................................................................... 9

*Seiber v. United States,*
    364 F.3d 1356 (Fed. Cir. 2004) ................................................................................ 31

*Sharp v. United States,*
    566 F.2d 1190, 215 Ct. Cl. 883 (1977) .............................................................. 24, 25

*Souders v. S.C. Pub. Serv. Auth.,*
    497 F.3d 1303 (Fed. Cir. 2007) ................................................................................ 22

*St. Christopher Assocs., LP v. United States,*
    511 F.3d 1376 (Fed. Cir. 2008) .......................................................................... 34, 35

*Starr Int'l Co. v. Fed. Reserve Bank of New York,*
    906 F. Supp. 2d 202 (S.D.N.Y. 2012) ..................................................................... 13

*Suitum v. Tahoe Reg'l Planning Agency,*
    520 U.S. 725 (1997) ............................................................................................ 37, 39

*Sun Oil Co.v. United States,,*
    572 F.2d 786 (Ct. Cl. 1978) ..................................................................................... 34

*Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency,*
    535 U.S. 302 (2002) .................................................................................................. 30

*Taylor v. United States,*
    303 F.3d 1357 (Fed. Cir. 2002) ................................................................................ 21

*Texas v. United States,*
    523 U.S. 296 (1998) ............................................................................................ 37, 38

*Ultra-Precision Mfg., Ltd. v. Ford Motor Co.,*
    338 F.3d 1353 (Fed. Cir. 2003) .................................................................................. 8

*United Copper Sec. Co. v. Amalgamated Copper Co.*,
244 U.S. 261 (1917) ........................................................................ 12

*United Pub. Workers v. Mitchell*,
330 U.S. 75 (1947) .......................................................................... 36

*United States v. Kimbell Foods, Inc.*,
440 U.S. 715 (1979) ........................................................................ 35

*United States v. Mitchell*,
445 U.S. 535 (1980) ........................................................................ 21

*Usery v. Turner Elkhorn Mining Co.*,
428 U.S. 1 (1976) ............................................................................ 33

*Yuba Goldfields, Inc. v. United States*,
723 F.2d 884 (Fed. Cir. 1983) ........................................................ 35

## CONSTITUTIONAL PROVISIONS, STATUTES, AND REGULATION

U.S. Const. amend. V ........................................................................ 26

U.S. Const. art. III ............................................................................ 36

12 U.S.C. § 1719(a), (b) ..................................................................... 6

12 U.S.C. § 1821(d)(2)(A)(i) ............................................................ 23

12 U.S.C. § 4513(b)(4) (2006) ........................................................... 5

12 U.S.C. § 4617 ...................................................................... passim

12 U.S.C. § 4619 (2006) ................................................................... 27

12 U.S.C. §§ 4501 et seq. (2007) ....................................................... 5

28 U.S.C. § 1491 ....................................................................... 21, 24

28 U.S.C. § 2680(a) ......................................................................... 25

12 C.F.R. § 1710.10(b) ..................................................................... 14

IN THE UNITED STATES COURT OF FEDERAL CLAIMS

| | | |
|---|---|---|
| BRYNDON FISHER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | No. 13-608C |
| v. | ) | (Judge Sweeney) |
| | ) | |
| THE UNITED STATES, | ) | |
| | ) | |
| Defendant. | ) | |

## **DEFENDANT'S MOTION TO DISMISS**

Pursuant to Rules 12(b)(1), 12(b)(6), and 23.1 of the Rules of the United States Court of Federal Claims (RCFC), defendant, the United States, respectfully requests that the Court dismiss the first amended consolidated derivative complaint (complaint) filed by plaintiffs, Bryndon Fisher, *et al.*,[1] for lack of subject matter jurisdiction and for failure to state a claim upon which relief may be granted.  In support of this motion, we rely upon plaintiffs' complaint and the following brief.

## **INTRODUCTION**

This is one of several cases about the rescue of the Federal National Mortgage Association (Fannie Mae) and the Federal Home Loan Mortgage Corporation (Freddie Mac) (collectively, the Enterprises).  Exercising authority expressly granted by Congress, the Federal Housing Finance Agency (FHFA) placed the two failing mortgage giants into conservatorships in September 2008, while the Department of the Treasury (Treasury) committed to restore the safety and soundness of the Enterprises through agreements to make hundreds of billions of

---

[1] By order dated October 30, 2013, the Court consolidated *Shipmon v. United States*, No. 13-672C, with the action in this case under the *Fisher* caption and docket number.  All citations to plaintiffs' complaint refer to the first amended consolidated derivative complaint filed by plaintiffs on December 2, 2013.

dollars available.  The conservatorships and capital infusion were necessary because massive

losses had left the Enterprises facing insolvency and without the ability to raise sufficient capital

in the marketplace.

Plaintiffs own common stock in Fannie Mae.  They purchased and held their shares with

the knowledge that, because of its critical role in the housing market, Fannie Mae is subject to

broad Federal authority and regulation.  Plaintiffs did not challenge the rescue of Fannie Mae in

2008.  In fact, plaintiffs stood by for years without protest as Government assistance resuscitated

Fannie Mae.  Only now, after the conservatorship has been in place for five years – and only

after Fannie Mae's financial situation has improved – have plaintiffs filed this suit, alleging that

a 2012 modification to FHFA's funding agreement with Treasury, known as the Third

Amendment, constitutes a Fifth Amendment taking.

What sets this suit apart from the other coordinated actions in this Court is that this suit is

styled as a shareholder derivative action.  It is, however, well-established that Fannie Mae

shareholders have no authority to pursue a derivative action on behalf of Fannie Mae.  Under the

Housing and Economic Recovery Act of 2008 (HERA), 12 U.S.C. § 4617, FHFA succeeded to

all shareholder rights when Fannie Mae entered conservatorship.  This includes the right to

pursue a shareholder derivative action, as every court to have considered the question has

concluded.  Accordingly, plaintiffs lack standing to sue.

Even if HERA did not bar shareholder derivative actions, the Court should dismiss the

complaint because plaintiffs failed to make a demand of Fannie Mae's conservator, FHFA,

before commencing suit, and there is no legitimate basis to excuse their failure to do so.

Moreover, plaintiffs fail to allege facts that could state a viable takings claim.  First, they

do not identify a legally cognizable property interest for purposes of the Fifth Amendment.  Even

if they had, there is no allegation of a physical invasion-type taking.  The Court, then, is left to consider plaintiffs' allegations as a regulatory taking.  However, the United States Court of Appeals for the Federal Circuit has consistently held that no taking occurs when Federal regulators act in their capacity as the conservator or receiver of a financial institution.  *See Golden Pac. Bancorp v. United States*, 15 F.3d 1066, 1073-74 (Fed. Cir. 1994); *Cal. Hous. Sec., Inc. v. United States*, 959 F.2d 955, 957-59 (Fed. Cir. 1992).

Plaintiffs' claims are also defeated by their acknowledgment that the funding agreement is a contract between Fannie Mae and Treasury.  When the Government engages in commercial transactions, acting in its proprietary – as opposed to its sovereign – capacity, such actions cannot constitute a taking.  As a result, there is no basis upon which to claim that the challenged action can be a taking.

Even before reaching these issues, however, plaintiffs' suit faces other decisive barriers.  Plaintiffs' complaint focuses on FHFA's actions as conservator of Fannie Mae and specifically on FHFA's decisions to enter into certain funding agreements with Treasury.  Yet, plaintiffs cannot invoke this Court's jurisdiction to challenge FHFA's actions, given clear precedent that a Government regulator acting as a conservator is not the United States for purposes of the Tucker Act.  To the extent that plaintiffs allege tort-like claims, those too fall outside the Court's jurisdiction.  Further, plaintiffs' claims are not ripe for review because they are contingent upon uncertain, future events.

The Court should dismiss plaintiffs' claims.

## STATEMENT OF FACTS

### I.     History Of Fannie Mae

Congress chartered Fannie Mae to supply capital to the United States' home mortgage

market and to promote access to mortgage credit.  Compl. ¶¶ 3, 41.  Although technically a

private corporation, Fannie Mae is a Government-Sponsored Enterprise (GSE) that purchases

and securitizes residential mortgages.  *Id.* ¶¶ 3, 26, 42-43.  This entity, which owns or guarantees

trillions of dollars of residential mortgages and mortgage-backed securities, has played and

continues to play a key role in housing finance and the United States economy.  *See id.* ¶¶ 3, 41-

43, 47.

From its inception as a GSE, Fannie Mae has been subject to Federal regulation and

oversight, as well as Congressional authority to amend, at any time, Fannie Mae's charter statute.

Congress initially chartered Fannie Mae in 1938 as a Government-held association, and later

established it as a shareholder-owned corporation in 1968.  *Id.* ¶¶ 41-42.[2]  The 1968 legislation

granted the Secretary of Housing and Urban Development (HUD) general regulatory authority

over Fannie Mae.  *See* GAO-09-782 at 13.

In 1992, Congress enacted the Federal Housing Enterprises Financial Safety and

Soundness Act (the Safety and Soundness Act), Pub. L. No. 102-550, §§ 1301-1395, 106 Stat.

3941-4012, legislation that not only revised regulation of Fannie Mae, but also established the

Office of Federal Housing Enterprise Oversight (OFHEO) to monitor its compliance with capital

standards.  Compl. ¶ 45; GAO-09-782 at 15-16.  In addition to OFHEO's role, HUD maintained

certain regulatory authority over Fannie Mae, particularly with respect to setting goals for

---

[2]  *See also* U.S. Government Accountability Office, *Fannie Mae and Freddie Mac: Analysis of Options for Revising the Housing Enterprises' Long-term Structures*, at 12-13 (Sept. 2009), http://www.gao.gov/new.items/d09782.pdf (hereinafter "GAO-09-782").

mortgage purchases and enforcing compliance with these goals.  GAO-09-782 at 16; *see* Pub. L. No. 102-550, §§ 1301-1395, 106 Stat. 3941-4012; 12 U.S.C. §§ 4501 et seq. (2007).  The Safety and Soundness Act vested OFHEO with conservatorship authority over Fannie Mae.  Compl. ¶ 45; 12 U.S.C. § 4513(b)(4) (2006).

## II.      The Housing And Economic Recovery Act Of 2008

In 2007, the United States' housing market and mortgage banking industry began a "precipitous decline as part of the global financial crisis," suffering significant losses.  Compl. ¶ 46.  Consequently, in 2007 and 2008, Fannie Mae began to experience increasing losses in its holdings in subprime mortgages and other mortgage-backed securities.  *See id.*; GAO-09-782 at 7, 28.  At the same time, Fannie Mae faced a severe reduction in the value of its assets and a critical decline in its ability to raise capital.  *See* Compl. ¶ 46; GAO-09-782 at 28.

In July 2008, Congress enacted HERA.  Pub. L. No. 110-289, 122 Stat. 2654; Compl. ¶ 47.  Through HERA, Congress transitioned regulatory oversight of Fannie Mae from OFHEO to a newly-created successor, FHFA.  Compl. ¶ 47.  As part of this transition, Congress transferred conservatorship authority to FHFA and added authority for FHFA to (1) place Fannie Mae into receivership, and (2) liquidate Fannie Mae's assets.  *Id.*; 12 U.S.C. § 4617(a)(2).  As conservator or receiver, FHFA, by operation of law, "succeed[s] to . . . all rights, titles, powers, and privileges" of Fannie Mae and is authorized to "take over the assets of and operate [Fannie Mae] with all the powers of the shareholders, the directors, and the officers."  12 U.S.C. § 4617(b)(2)(A)(i), (B)(i); *see also* Compl. ¶ 89.

In addition, HERA granted Treasury the authority to infuse taxpayer funds into Fannie Mae to stabilize the housing market and the United States economy.  Compl. ¶¶ 5, 52.  Specifically, Treasury was permitted to purchase securities from Fannie Mae to "(i) provide

stability to the financial markets; (ii) prevent disruptions in the availability of mortgage finance; and (iii) protect the taxpayer."  12 U.S.C. § 1719(a), (b); *see also* Compl. ¶ 52.

## III.  The Government's Rescue Of Fannie Mae

The Government was called upon to rescue Fannie Mae when its investment strategies left the company exposed to the disintegrating housing market, while it faced declining access to capital markets.

Beginning in 2007, and continuing through 2008, Fannie Mae suffered significant losses on its mortgage portfolios and guarantees.  *See* Compl. ¶ 46; GAO-09-782 at 7, 28.  In early September 2008, FHFA determined that Fannie Mae had severe capital deficiencies and was operating in an unsafe and unsound manner.  *See* Press Release, FHFA, Statement of FHFA Director James B. Lockhart, at 5-6 (Sept. 7, 2008);[3] *see also* GAO-09-782 at 7, 28.  Accordingly, on September 6, 2008, after obtaining the consent of Fannie Mae's board of directors, FHFA's Director placed Fannie Mae into conservatorship pursuant to 12 U.S.C. § 4617.  Compl. ¶ 48 n.7; *see also id.* ¶ 6.

Pursuant to HERA, FHFA, as conservator, entered into a Senior Preferred Stock Purchase Agreement with Treasury (the Stock Agreement) to maintain Fannie Mae's solvency.  *Id.* ¶¶ 7, 53.  In the Stock Agreement, Treasury agreed to provide Fannie Mae with the funding necessary to maintain a positive net worth and thereby avoid the statutory trigger for receivership and liquidation.  Treasury initially made $100 billion available to support Fannie Mae.  *Id.* ¶ 54.  In exchange for this capital lifeline, Treasury received $1 billion in senior preferred stock from Fannie Mae immediately, a 10-percent dividend on amounts that Treasury provided to Fannie

---

[3] *Available at* http://www.fhfa.gov/webfiles/23/FHFAStatement9708final.pdf

Mae, and warrants to acquire 79.9 percent of Fannie Mae's common stock. *Id.* ¶¶ 7, 54-55. Treasury has not exercised the warrants.

In May 2009, the parties amended the Stock Agreement, increasing Treasury's commitment to $200 billion. *Id.* ¶ 54 n.8. In December 2009, Treasury determined that $200 billion was insufficient, given that the GSEs remained at risk to experience net worth deficits in excess of that amount. Accordingly, Treasury and FHFA again amended the Stock Agreement to replace the fixed caps with a formula whereby Treasury increased the amount of capital support available through the Stock Agreement by the amount of any draws between January 1, 2010, and December 31, 2012. *Id.* ¶ 54 n.8.

In August 2012, FHFA, acting as conservator for Fannie Mae, entered into the Third Amendment to the Stock Agreement. *See id.* ¶¶ 11, 65. The Third Amendment eliminated the Stock Agreement's provisions requiring the payment of a fixed, 10-percent dividend. *See* Compl. ¶ 66. Instead, Fannie Mae now pays a quarterly variable dividend – known as a "net worth sweep" – only if Fannie Mae has a positive net worth after accounting for prescribed capital reserves. *Id.* ¶ 66 n.11. If Fannie Mae's net worth is negative in any quarter, no dividend is due.

## IV.    Plaintiffs' Suit In This Court

Plaintiffs, owners of common stock in Fannie Mae, allege that the execution of the Third Amendment – between FHFA, acting as conservator, and Treasury – took the private property of Fannie Mae. *Id.* ¶¶ 1-2, 10, 16-19, 22-24, 86, 108-110. Specifically, plaintiffs contend that the operation of the "net worth sweep" constituted a taking by "expropriat[ing] all remaining profits and value in the Company . . . without providing just compensation to the Company." *Id.* ¶ 10.

7

Plaintiffs purport to bring shareholder derivative claims on behalf of Fannie Mae. *Id.* ¶ 1. Plaintiffs, however, have not made a demand on Fannie Mae's board of directors or FHFA to pursue these claims. *See id.* ¶¶ 87-105. Plaintiffs allege that a demand would be futile and is, therefore, excused. *Id.*

**ARGUMENT**

I.    **Standards Of Review**

"Jurisdiction is a threshold issue and a court must satisfy itself that it has jurisdiction to hear and decide a case before proceeding to the merits." *Ultra-Precision Mfg., Ltd. v. Ford Motor Co.*, 338 F.3d 1353, 1356 (Fed. Cir. 2003) (quoting *PIN/NIP, Inc. v. Platte Chem. Co.*, 304 F.3d 1235, 1241 (Fed. Cir. 2002)). If the Court determines that "it lacks jurisdiction over the subject matter, it must dismiss the claim." *Matthews v. United States*, 72 Fed. Cl. 274, 278 (2006); RCFC 12(h)(3). In deciding a motion to dismiss for lack of subject matter jurisdiction, the Court may consider evidentiary matters outside the pleadings. *Indium Corp. of Am. v. Semi-Alloys, Inc.*, 781 F.2d 879, 884 (Fed. Cir. 1985).

The Court must dismiss a complaint that does not plausibly give rise to an entitlement to relief. RCFC 12(b)(6). To avoid dismissal for failure to state a claim under RCFC 12(b)(6), "a complaint must allege facts 'plausibly suggesting (not merely consistent with)' a showing of entitlement to relief." *Acceptance Ins. Cos. v. United States*, 583 F.3d 849, 853 (Fed. Cir. 2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 557 (2007)). The Court should dismiss where the complaint fails to "'state a claim to relief that is plausible on its face.'" *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (quoting *Twombly*, 550 U.S. at 570). A claim is facially implausible if it does not permit the Court "to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). Allegations "that are

8

'merely consistent with' a defendant's liability" and "[t]hreadbare recitals of the elements of a cause of action, supported by mere conclusory statements, do not suffice." *Id.*

The purpose of RCFC 12(b)(6) "is to allow the court to eliminate actions that are fatally flawed in their legal premises and destined to fail, and thus to spare litigants the burdens of unnecessary pretrial and trial activity." *Advanced Cardiovascular Sys., Inc. v. SciMed Life Sys., Inc.*, 988 F.2d 1157, 1160 (Fed. Cir. 1993) (citation omitted).  RCFC 12(b)(6), thus, "enable[s] defendants to challenge the sufficiency of complaints without subjecting themselves to discovery." *Rutman Wine Co. v. E. & J. Gallo Winery*, 829 F.2d 729, 738 (9th Cir. 1987).

## II.     Under HERA, Shareholders Lack Standing To Bring A Derivative Suit On Behalf Of Fannie Mae

Plaintiffs lack standing to assert a derivative action on behalf of Fannie Mae because HERA's plain language bars Fannie Mae shareholders from asserting derivative claims on Fannie Mae's behalf.

A party invoking Federal jurisdiction must establish standing.  *Lujan v. Defenders of Wildlife*, 504 U.S. 555, 560-61 (1992).  "Normally, a corporation's board of directors has complete discretion to prosecute the corporation's causes of action."  *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d 790, 794-95 (E.D. Va. 2009), *aff'd sub nom. La. Mun. Police Emps. Ret. Sys. v. Fed. Hous. Fin. Agency*, 434 F. App'x 188 (4th Cir. 2011).  In limited circumstances, shareholders are permitted to pursue derivative actions, whereby they "step into the shoes of the corporation and file suit as fiduciaries on the corporation's behalf and for the corporation's benefit."  *First Hartford Corp. Pension Plan & Trust v. United States*, 194 F.3d 1279, 1293 (Fed. Cir. 1999).  Under HERA, however, shareholders have no authority to pursue a derivative action on behalf of Fannie Mae.  *Kellmer v. Raines*, 674 F.3d 848, 850 (D.C. Cir. 2012).

HERA provides that, upon appointment as conservator, FHFA immediately succeeded, "by operation of law," to "all rights, titles, powers, and privileges of the regulated entity, and of any stockholder, officer, or director of such regulated entity with respect to the regulated entity and the assets of the regulated entity."  12 U.S.C. § 4617(b)(2)(A)(i).  The United States Court of Appeals for the District of Columbia Circuit has observed that "[t]his language plainly transfers shareholders' ability to bring derivative suits – a 'right[ ], title[ ], power[ ], [or] privilege[ ]' – to FHFA."  *Kellmer*, 674 F.3d at 850.

After FHFA became conservator for Fannie Mae and Freddie Mac, every court to consider the issue has concluded that GSE shareholders lack standing to pursue derivative claims on behalf of the GSEs.  For example, in *Esther Sadowsky Testamentary Trust v. Syron*, 639 F. Supp. 2d 347 (S.D.N.Y. 2009), a shareholder trust was pursuing a derivative action against former Freddie Mac directors and officers when Freddie Mac entered conservatorship.  *Id.* at 349.  After FHFA became conservator for Freddie Mac, FHFA moved to substitute itself as plaintiff in place of the shareholder trust.  *Id.*  The district court granted the motion, finding that FHFA was the true party at interest, rather than the trust.  *Id.* at 350.  The court explained:

> The Court finds that under the plain language of HERA, "all rights, titles, powers, and privileges" of Freddie Mac's shareholders are now vested in the FHFA.  12 U.S.C. § 4617(b)(2)(A).  These include the right to bring an action on Freddie Mac's behalf[.]  The FHFA is therefore the true party at interest in this case and should be substituted for the Trust.

*Esther Sadowsky Testamentary Trust*, 639 F. Supp. 2d at 350.

Likewise, in a group of cases consolidated in the United States District Court for the District of Columbia, Fannie Mae shareholders sought to maintain derivative actions on behalf of Fannie Mae against former officers and directors of Fannie Mae and third parties.  *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 629 F. Supp. 2d 1, 2 (D.D.C. 2009).

10

After FHFA became conservator for Fannie Mae, FHFA moved to substitute itself as plaintiff, explaining that FHFA was the sole entity with standing to pursue the derivative claims asserted in those cases.  *Id.* at 2.  The court agreed.  *Id.* at 3.  Noting that "[w]hen a federal statute's language is plain and unambiguous, the Court has no discretion but to follow it," *id.*, the district court found that "HERA's plain language compels the conclusion that, as Conservator for Fannie Mae, only the FHFA has standing to pursue the claims asserted in these actions."  *Id.* at 4.  The District of Columbia Circuit affirmed the district court's substitution order.  *Kellmer*, 674 F.3d at 850.

In the Fourth Circuit, courts have reached the same conclusion.  In a group of cases consolidated in the United States District Court for the Eastern District of Virginia, Freddie Mac shareholders sought to derivatively assert claims against former Freddie Mac board members.  *In re Fed. Home Loan Mortg. Corp. Derivative Litig.*, 643 F. Supp. 2d at 793.  After HERA was enacted and FHFA became conservator for Freddie Mac, FHFA moved to substitute itself for the plaintiffs, explaining that the plaintiffs lacked standing to assert derivative claims on behalf of Freddie Mac.  *Id.* at 794.  The court agreed and granted FHFA's motion, explaining that "the plain meaning of the statute is that *all* rights previously held by Freddie Mac's stockholders, including the right to sue derivatively, now belong exclusively to the FHFA."  *Id.* at 795.  On appeal, the United States Court of Appeals for the Fourth Circuit affirmed.  *La. Mun. Police Emps. Ret. Sys.*, 434 F. App'x at 191.

"Congress has transferred everything it could to [FHFA], and that includes a stockholder's right, power, or privilege to demand corporate action or to sue directors or others when action is not forthcoming."  *Kellmer*, 674 F.3d at 851 (quoting *Pareto v. F.D.I.C.*, 139 F.3d 696, 700 (9th Cir. 1998)).  In short, "[t]he shareholders' rights are now the FHFA's."  *Esther*

11

*Sadowsky Testamentary Trust*, 639 F. Supp. 2d at 351.  Accordingly, plaintiffs lack standing to pursue a derivative action on behalf of Fannie Mae, and the complaint should be dismissed.

**III.**   **There Is No Basis To Excuse Plaintiffs' Failure To Make A Demand Of FHFA**

Even if plaintiffs' derivative claims were not barred by HERA, which they are, RCFC 23.1 would require dismissal because plaintiffs have failed to satisfy the demand requirement or demonstrate that a demand would be futile.

**A.**   **This Derivative Complaint Should Be Dismissed Because Plaintiffs Failed To Make A Pre-Suit Demand**

The Court should dismiss plaintiffs' complaint because they did not demand action by Fannie Mae before commencing suit.

Among the most fundamental principles of corporate law is the tenet "that the decisions of a corporation – including the decision to initiate litigation – should be made by the board of directors," or comparable authority.  *Daily Income Fund, Inc. v. Fox*, 464 U.S. 523, 530 (1984).  "Whether or not a corporation shall seek to enforce in the courts a cause of action for damages is, like other business questions, ordinarily a matter of internal management, and is left to the discretion of the directors, in the absence of instruction by vote of the stockholders."  *United Copper Sec. Co. v. Amalgamated Copper Co.*, 244 U.S. 261, 263 (1917).

Derivative actions, brought by individual shareholders seeking a court's imprimatur to displace the corporate authority and pursue the corporation's causes of action in their own name, inherently undermine this basic principle.  *See Daily Income Fund, Inc.*, 464 U.S. at 530.  To prevent abuse of the derivative action, the Supreme Court, in *Hawes v. City of Oakland*, 104 U.S. 450 (1881), "established a number of prerequisites to bringing derivative suits in the federal courts."  *Daily Income Fund, Inc.*, 464 U.S. at 530.  "These requirements were designed to limit the use of the device to situations in which, due to an unjustified failure of the corporation to act

12

for itself, it was appropriate to permit a shareholder 'to institute and conduct a litigation which usually belongs to the corporation.'" *Id.*

"The principal means by which the Court in *Hawes* sought to vindicate this policy was, of course, its requirement that a shareholder seek action by the corporation itself before bringing a derivative suit." *Daily Income Fund, Inc.*, 464 U.S. at 532.  Accordingly, shareholders' right to sue derivatively presumptively does not arise until they have exhausted intra-corporate remedies by making demands of the corporate authority and having them refused.  *See Hawes*, 104 U.S. at 460-61; *Starr Int'l Co. v. Fed. Reserve Bank of New York*, 906 F. Supp. 2d 202, 255 (S.D.N.Y. 2012) (quoting *Kaplan v. Peat, Marwick, Mitchell & Co.*, 540 A.2d 726, 730 (Del. 1988)).

The obligation to make a pre-suit demand is as deeply ingrained in the law as the derivative action itself.  In 1881, the Supreme Court explained:

> [B]efore the shareholder is permitted in his own name to institute and conduct a litigation which usually belongs to the corporation, he should show to the satisfaction of the court that he has exhausted all the means within his reach to obtain, within the corporation itself, the redress of his grievances, or action in conformity to his wishes.

*Hawes*, 104 U.S. at 460-61.  Moreover, the shareholder "must make an earnest, not a simulated effort, with the managing body of the corporation, to induce remedial action on their part, and this must be made apparent to the court." *Id.* at 461.

The demand requirement "affords the directors an opportunity to exercise their reasonable business judgment and 'waive a legal right vested in the corporation in the belief that its best interests will be promoted by not insisting on such right.'" *Daily Income Fund, Inc.*, 464 U.S. at 533.  For an entity in conservatorship, the demand must be made on the conservator. *See, e.g.*, *Landy v. F.D.I.C.*, 486 F.2d 139, 147 (3d Cir. 1973) ("When a corporation is in

receivership, any demand to bring suit in its behalf must be made upon the receiver rather than the directors.")

Plaintiffs do not allege that they have met the demand requirement, or that they have made any effort to do so.  Accordingly, plaintiffs have completely failed to meet the demand obligation, and should not be permitted to pursue this derivative claim on behalf of Fannie Mae. *See* RCFC 23.1(b)(3).

### B.   Plaintiffs' Failure To Make A Demand Cannot Be Excused

The complaint's allegations that a demand would have been futile do not excuse plaintiffs' failure to seek action by Fannie Mae, through its conservator, FHFA, before commencing suit.

### 1.   Legal Framework For Demand Futility

Delaware law provides a narrow exception to the demand requirement.[4]  Shareholders are not required to make a demand if it would be futile to do so.  *Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 782 (D.C. Cir. 2008).  "But consistent with the long-standing principle that directors and not shareholders manage a corporation, the Delaware precedents on demand futility make clear that the bar is high, the standards are stringent, and the situations where demand will be excused are rare."  *Id.* at 782-83.

---

[4]  In a derivative action founded on a provision of Federal law, the contours of the demand requirement are governed by Federal law; still, courts look to state law as the Federal rule of decision.  *See Kamen v. Kemper Fin. Servs., Inc.*, 500 U.S. 90, 97-101 (1991).  Fannie Mae, a District of Columbia corporation, has elected, consistent with applicable regulation, to follow Delaware General Corporation Law.  Compl. ¶ 26; Fannie Mae Bylaws, art. 1, § 1.05; 12 C.F.R. § 1710.10(b); *see also Pirelli Armstrong Tire Corp. Retiree Med. Benefits Trust ex rel. Fed. Nat'l Mortg. Ass'n v. Raines*, 534 F.3d 779, 783 n.1 (D.C. Cir. 2008).

For a demand to be excused as futile under the Delaware Supreme Court's decision in *Aronson v. Lewis*, 473 A.2d 805, 814 (Del. 1984), a plaintiff must plead "particularized facts creating a reasonable doubt that: '(1) the directors are disinterested and independent and (2) the challenged transaction was otherwise the product of a valid exercise of business judgment.'" *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d 9, 16 (D.D.C. 2007). If either prong is satisfied, demand is excused. *Brehm v. Eisner*, 746 A.2d 244, 256 (Del. 2000).

Under the first prong in *Aronson*, a plaintiff must show that a majority of the directors (or other corporate authority) were "incapable, due to personal interest or domination and control, of objectively evaluating a demand." *Id.* at 257. A person is "interested" if he or she "cannot be expected to exercise his or her independent business judgment without being influenced by the adverse personal consequences resulting from the decision." *Rales v. Blasband*, 634 A.2d 927, 936 (Del. 1993). If a director "will receive a personal financial benefit from a transaction that is not equally shared by the stockholders," he or she will be considered "interested." *Id.* "Directorial interest also exists where a corporate decision will have a materially detrimental impact on a director, but not on the corporation and the stockholders." *Id.*

"Independence means that a director's decision is based on the corporate merits of the subject before the board rather than extraneous considerations or influences." *Aronson*, 473 A.2d at 816. "[A] plaintiff charging domination and control of one or more directors must allege particularized facts manifesting 'a direction of corporate conduct in such a way as to comport with the wishes or interests of the corporation (or persons) doing the controlling.'" *Id.*

"If the first prong is not satisfied, there is a presumption that the Board's actions were the product of a valid exercise of business judgment." *In re Intel Corp. Derivative Litig.*, 621 F.

15

Supp. 2d 165, 170 (D. Del. 2009).  To show demand futility under *Aronson*'s second prong, a plaintiff must rebut this presumption by pleading "particularized facts sufficient to raise (1) a reason to doubt that the action was taken honestly and in good faith or (2) a reason to doubt that the board was adequately informed in making the decision."  *In re Walt Disney Co. Derivative Litig.,* 825 A.2d 275, 286 (Del. Ch. 2003).

Moreover, to meet the heightened pleading requirements applicable to derivative actions, the necessary showings must be made by particularized factual allegations in the complaint.  *See* RCFC 23.1(b); *Gaubert v. Fed. Home Loan Bank Bd.*, 863 F.2d 59, 68 (D.C. Cir. 1988).  "Conclusory allegations that demand would have been futile are insufficient."  *In re Fed. Nat'l Mortg. Ass'n Sec., Derivative, & "ERISA" Litig.*, 503 F. Supp. 2d at 14.  A plaintiff asserting a derivative action must "state with particularity: (A) any effort by the plaintiff to obtain the desired action from the directors or comparable authority and, if necessary, from the shareholders or members; and (B) the reasons for not obtaining the action or not making the effort."  RCFC 23.1(b)(3).

<h3>2. Plaintiffs Fail To Allege Specific Facts Necessary To Meet The Exacting Pleading Requirements For Demand Futility</h3>

Although plaintiffs assert demand futility, they fail to meet their burden under RCFC 23.1(b)(3)(B) to establish demand futility, and the Court should, therefore, dismiss the complaint.  None of plaintiffs' allegations offers a sound basis to conclude that FHFA, as conservator, is incapable of acting independently and disinterestedly on behalf of Fannie Mae.  Nor do plaintiffs make particularized factual allegations sufficient to rebut the presumption of the business judgment rule.

First, plaintiffs cloud the demand issue with a series of allegations regarding making a demand on Fannie Mae's board of directors.  Compl. ¶¶ 87-96.  These, of course, are irrelevant

and should be disregarded.  Fannie Mae is in conservatorship; the demand must properly be directed to FHFA, as Fannie Mae's conservator.  *See Landy*, 486 F.2d at 147.

Plaintiffs' allegations that a demand on FHFA would be futile, Compl. ¶¶ 97-105, are speculative, conclusory, and misguided.  According to plaintiffs, "FHFA has manifest, disabling, and irreconcilable conflicts of interest with respect to this action and lacks the independence necessary to consider a pre-suit demand."  Compl. ¶ 97.  They allege that it would be "impractical, if not absurd, for the FHFA, an agency of the United States government, to sue the United States government."  *Id.* ¶ 98.  However, the assertion that demand is excused because directors would have to sue themselves "has been repeatedly rejected by Delaware courts."  *In re Intel Corp. Derivative Litig.*, 621 F. Supp. 2d at 179; *see Kanter v. Barella,* 489 F.3d 170, 180 (3d Cir. 2007) ("The bare allegation that a board is interested because its members would be reluctant to sue themselves has been considered and rejected."); *Brehm*, 746 A.2d at 257 n.34 ("It is no answer to say that demand is necessarily futile because (a) the directors 'would have to sue themselves . . .' or (b) that they approved the underlying transaction."); *In re Citigroup Inc. S'holder Derivative Litig.,* 964 A.2d 106, 121 (Del. Ch. 2009) ("Demand is not excused solely because the directors would be deciding to sue themselves.").

Plaintiffs' allegation that "FHFA's conduct is at the heart of this action, which challenges the very unconstitutional actions in which the FHFA participated," Compl. ¶ 98, is no more persuasive.  The fact that a corporate authority has previously approved a transaction that is subsequently challenged in a derivative suit does not strip the corporate authority of its right to receive and consider a pre-suit demand.  *See Lewis v. Graves*, 701 F.2d 245, 248 (2d Cir. 1983).  After all, "[d]erivative suits are almost invariably directed at major . . . corporate transactions.  By virtue of their offices, directors ordinarily participate in the decision making involved in such

17

transactions.  Excusing demand on the mere basis of prior board acquiescence, therefore, would obviate the need for demand in practically every case."  *Id.* (internal citation omitted).

The most pervasive shortcoming in plaintiffs' demand-futility allegations is their failure to appreciate that the demand they would be required to make on FHFA, if derivative actions were not barred altogether by HERA, would be a demand on FHFA in its role as conservator for Fannie Mae, not in FHFA's capacity as a regulator.  FHFA's distinct roles as regulator and as conservator are well-recognized.  *See, e.g.*, *Leon Cnty., Fla. v. Fed. Hous. Fin. Agency*, 816 F. Supp. 2d 1205, 1207-08 (N.D. Fla. 2011), *aff'd*, 700 F.3d 1273 (11th Cir. 2012).  Indeed, experience demonstrates that Federal agencies, when acting in the role of receiver for a private entity, have not shied away from litigating that private entity's claims against the United States if the receiver determines that it is in the private entity's interest to do so.  *See, e.g.*, *Landmark Land Co. v. F.D.I.C.*, 256 F.3d 1365, 1379 (Fed. Cir. 2001) (describing how the Federal Deposit Insurance Corporation (FDIC), as receiver, intervened to assert claims totaling hundreds of millions of dollars against the United States).

Plaintiffs' allegations that FHFA would be influenced by an interagency relationship with Treasury are similarly misplaced.  Compl. ¶¶ 99-101.  Any speculation that Government officials at Treasury would interfere with, or improperly influence, FHFA's decisions as conservator for Fannie Mae is not only without basis or supporting factual allegations in the complaint but also contrary to the "presumption that public officers perform their duties correctly, fairly, in good faith, and in accordance with law."  *Parsons v. United States*, 670 F.2d 164, 166 (Ct. Cl. 1982).

The type of allegations offered by plaintiffs have been heard and rejected by courts before.  More than 30 years ago, in *Landy*, the United States Court of Appeals for the Third Circuit stated:

18

> The amended complaint alleges that a demand upon the FDIC would have been futile because, as receiver, it would be unable to sue because of its "conflict of interest between various government agencies and its regulatory and insurance functions." These allegations do not supply with particularity the reasons for failing to make the demand required by Rule 23.1. Instead of being "a statement of appropriate and convincing facts" that a demand would have been futile, it is merely a vague, conclusory statement. . . . We do not believe that even the reasons asserted on this appeal as grounds for relieving the plaintiffs of making demand upon the receiver to bring suit are adequate.

*Landy*, 486 F.2d at 148-49 (internal citation omitted). In this case, plaintiffs similarly have no valid excuse for failing to make a demand of Fannie Mae's conservator before commencing suit.

Finally, plaintiffs' allegation that the Third Amendment served no legitimate business purpose, Compl. ¶ 105, is undermined by their own allegations and fails to satisfy RCFC 23.1(b)(3)(B). For example, plaintiffs acknowledge that the Third Amendment alleviated Fannie Mae's prior obligation to pay a 10-percent annual dividend. Compl. ¶ 66. They also allege that, according to a Treasury press release, "the Net Worth Sweep would 'help expedite the wind down of Fannie Mae' and 'support the continued flow of mortgage credit during a responsible transition to a reformed Housing market.'" *Id.* ¶ 70. On their face, these allegations describe legitimate business purposes. Thus, the challenge to the Third Amendment's legitimacy cannot excuse the plaintiffs' failure to make a demand on FHFA as Fannie Mae's conservator.

Indeed, the importance of requiring a demand and allowing FHFA, as conservator, to control any litigation brought on behalf of Fannie Mae is further magnified by the mandate codified at 12 U.S.C. § 4617(f), which provides: "Except as provided in this section or at the request of the Director, no court may take any action to restrain or affect the exercise of powers or functions of the Agency as a conservator or a receiver." 12 U.S.C. § 4617(f).

Thus, there is no basis for the Court to find that a demand on FHFA, as conservator, would be futile or that plaintiffs' failure to make a demand can be excused. Accordingly, the Court should dismiss the complaint.

## IV.  The Court Lacks Jurisdiction Over Plaintiffs' Complaint

Plaintiffs' claims arise out of actions, including the adoption of the Third Amendment, that were taken as part of the Fannie Mae conservatorship. Plaintiffs' claims are also based, in part, on allegations of wrongful conduct. Because this Court lacks jurisdiction over challenges to conservatorship actions, as well as claims that sound in tort, the Court should dismiss the complaint.

### A.  The Complaint Challenges Actions Of The Conservator, But FHFA Is Not The United States When It Acts As Conservator

The Court should reject plaintiffs' contention that their claims can be heard by this Court pursuant to the Tucker Act. Plaintiffs allege that actions during the course of FHFA's administration of Fannie Mae in conservatorship have taken, without just compensation, property of Fannie Mae, *see, e.g.*, Compl. ¶¶ 79-86, despite the fact that the Government provided Fannie Mae with over $116 billion to prevent Fannie Mae from becoming insolvent. According to plaintiffs, FHFA's execution of the Third Amendment – and specifically the "net worth sweep" – allegedly deprived Fannie Mae of "its entire economic value." *Id.* ¶ 86.

Plaintiffs' allegations focus on FHFA's actions as conservator and specifically on its decision to enter into the Third Amendment with Treasury. For purposes of this Court's jurisdiction, FHFA is not the United States, and plaintiffs have no basis to challenge Treasury's actions. Treasury could not have acted without FHFA, and Treasury's act of entering into a voluntary agreement with FHFA cannot form the basis of a takings claim. Accordingly, plaintiffs' claims must fail.

1.      **The Tucker Act Grants The Court Of Federal Claims Jurisdiction Over Claims Against The United States**

The Tucker Act establishes – and thus limits – this Court's jurisdiction.  28 U.S.C. § 1491; *United States v. Mitchell*, 445 U.S. 535, 538 (1980).  Under the Tucker Act, the Court may only "render judgment upon any claim against the United States."  28 U.S.C. § 1491(a)(1); *see Brown v. United States*, 105 F.3d 621, 624 (Fed. Cir. 1997).  Plaintiffs bear the burden of establishing the Court's jurisdiction and must establish that the party they are suing is, in fact, the United States.  *See Taylor v. United States*, 303 F.3d 1357, 1359-60 (Fed. Cir. 2002).

2.      **For Purposes Of The Tucker Act, FHFA Is Not The United States When Acting As Conservator For Fannie Mae**

The Court should dismiss the complaint because a Government regulatory agency – acting as conservator – is not the United States.

In addressing the question of whether FHFA is a Federal actor as a consequence of placing Fannie Mae into conservatorship, the United States District Court for the District of Columbia recently held that "FHFA as conservator of Fannie Mae is not a government actor." *Herron v. Fannie Mae*, 857 F. Supp. 2d 87, 96 (D.D.C. 2012).  Other courts reached the same conclusion when the FDIC acted as conservator or receiver of banks.  *See O'Melveny & Myers v. F.D.I.C.*, 512 U.S. 79, 85 (1994) (FDIC acting as receiver "is not the United States"); *Ameristar Fin. Servicing, Co. v. United States*, 75 Fed. Cl. 807, 812 (2007) (dismissing claim because the FDIC as conservator "was not acting as the United States").

Here, FHFA, acting as conservator for a congressionally-chartered, private institution, stands in the shoes of Fannie Mae.  Thus, plaintiffs' claims against FHFA for its actions as conservator on behalf of Fannie Mae are effectively claims against Fannie Mae.  Plaintiffs do not

allege that Fannie Mae is a Government entity, nor would such an allegation make sense given that they are attempting to bring this action on behalf of Fannie Mae.

This Court has jurisdiction only "to hear cases in which a plaintiff seeks just compensation for a taking under the Fifth Amendment as such a claim is 'against the United States founded . . . upon the Constitution.'" *Souders v. S.C. Pub. Serv. Auth.*, 497 F.3d 1303, 1307-08 (Fed. Cir. 2007). Indeed, the Fifth Amendment applies solely to Government action. "There clearly can be no taking when whatever acts complained of are those of private parties, not the government." *Alves v. United States*, 133 F.3d 1454, 1458 (Fed. Cir. 1998); *see 767 Third Ave. Assocs. v. United States*, 48 F.3d 1575, 1580 (Fed. Cir. 1995).

In *Ameristar*, plaintiff sued the FDIC under the Tucker Act for the FDIC's actions as conservator for a failed bank's successor. 75 Fed. Cl. at 809. The Court, relying on the Supreme Court's *O'Melveny* decision and the FDIC conservatorship statute, held that the FDIC "was not acting as the United States" when it "'stepped into the shoes'" of a bank in conservatorship. *Id.* at 812. The Court dismissed the complaint because Ameristar's claims were between two non-governmental entities and the FDIC was "not the United States" for purposes of the Tucker Act. *Id.*

This principle applies equally to FHFA, which operates pursuant to a conservatorship statute, patterned after the FDIC statute, that authorizes FHFA to "step[] into the shoes" of Fannie Mae. *See Herron*, 857 F. Supp. 2d at 94. "Thus, like FDIC when it serves as a conservator or receiver of a private entity, FHFA when it serves as conservator 'step[s] into the shoes' of the private corporation." *Id.*[5] Because FHFA as conservator does not act as the United

---

[5] The FDIC conservatorship statute authorizes the FDIC, as conservator, to "succeed to . . . all rights, titles, powers, and privileges of the insured depository institution, and of any

States, the Court should dismiss plaintiffs' allegations insofar as the complaint challenges the actions of FHFA as conservator for entering into the Third Amendment. *See Ameristar Fin. Servicing Co.*, 75 Fed. Cl. at 812; *see also I.M. Frazer v. United States*, 288 F.3d 1347, 1354 (Fed. Cir. 2002) (quoting *O'Melveny & Myers*, 512 U.S. at 85); *Ambase Corp. v. United States*, 61 Fed. Cl. 794, 796-97 (2004) (claim that FDIC mismanaged receivership is not a claim against the Government); *AG Route Seven P'ship v. United States*, 57 Fed. Cl. 521, 534 (2003) (as receiver, "the FDIC's attendant role herein is tantamount to that of a private party and not the government *per se*.").

Plaintiffs similarly have no basis to challenge Treasury's actions. FHFA, on behalf of Fannie Mae, entered into the Third Amendment. Treasury, acting as the United States, was counterparty to that voluntary agreement. A voluntary agreement is "not a proper basis upon which to premise a takings claim." *Norman v. United States*, 429 F.3d 1081, 1089 (Fed. Cir. 2005). Treasury, alone, could not and did not take anything from Fannie Mae, unilaterally or otherwise. Treasury, alone, could not impose any "net worth sweep" on Fannie Mae. FHFA acted as a private corporation when it entered into the Third Amendment with Treasury; because there is no jurisdiction over FHFA's actions, there is no jurisdiction over plaintiffs' claims and this case should be dismissed.[6]

---

stockholder, member, accountholder, depositor, officer, or director of such institution with respect to the institution and the assets of the institution . . . ." 12 U.S.C. § 1821(d)(2)(A)(i). Similarly, FHFA's enabling statute authorizes the agency, as conservator, to "immediately succeed to . . . all rights, titles, powers, and privileges of [the Enterprises], and of any stockholder, officer, or director . . . ." 12 U.S.C. § 4617(b)(2)(A).

[6] In addition and independently, as explained below, because Treasury acted as the United States in its commercial or proprietary capacity with respect to the Third Amendment, plaintiffs fail to state any takings claim against Treasury.

**B.     The Court Lacks Jurisdiction To Entertain Plaintiffs' Challenge To FHFA's Discretion As Conservator**

Even if the Court concludes that it otherwise has jurisdiction over FHFA's actions as conservator, a position with which we disagree, the Tucker Act cannot support a takings claim based on allegations that FHFA abused its discretion, because the Tucker Act expressly precludes the Court from exercising jurisdiction over claims sounding in tort, 28 U.S.C. § 1491(a)(1).  The Court should, thus, reject plaintiffs' claims that, while Fannie Mae is operating in conservatorship, FHFA has improperly exercised its discretion with respect to the execution of the Third Amendment.

This Court's predecessor reached a similar conclusion when considering bank investors' takings claims after the Comptroller of the Currency placed the investors' bank into receivership. In *Golden Pacific Bancorp v. United States*, 25 Cl. Ct. 768, 769-70 (1992), *aff'd*, 15 F.3d 1066 (Fed. Cir. 1994), the court clarified that, pursuant to the Tucker Act, the plaintiffs could not challenge the propriety of the Comptroller's exercise of discretion because such an allegation would sound in tort.  *Id.* at 770 n.2.

Similarly, in *Sharp v. United States*, 566 F.2d 1190, 215 Ct. Cl. 883, 883-84 (1977) (unpublished), the plaintiffs claimed that the FDIC's "over-regulation" of their bank resulted in a taking.  Among other things, the plaintiffs alleged that the FDIC acted beyond its statutory authority when it transferred bank assets and demanded that the bank's directors close the bank. *Id.*  The Court of Claims held that it lacked jurisdiction over these allegations because the Tucker Act precludes claims sounding in tort.  *Id.* at 886.  The court then noted the significant jurisdictional hurdles a plaintiff must overcome to challenge an action by a Federal bank regulator in this Court: on one hand, if the challenged action in conservatorship is permitted by the applicable statute, there can be no regulatory taking (*see also* Section V.B, below); on the

24

other hand, if the action is *not* permitted by statute, "the plaintiff's claim must necessarily sound in tort." *Id.* at 885-86. Thus, regardless of how plaintiffs construct their pleading, they cannot state a claim over which this Court has jurisdiction.

The Court drew this same distinction in *Franklin Savings Corp. v. United States*, 46 Fed. Cl. 533, 535-37 (2000), emphasizing that challenges to the judgment of Federal regulators are not only tortious in character – and thus beyond the Court of Federal Claims' jurisdiction – but also are protected by the discretionary function exception to the Federal Tort Claims Act. *Id.* at 536; *see* 28 U.S.C. § 2680(a). This means that no matter how a plaintiff attempts to state its claim, "'just compensation' for a taking is not an available remedy" in the context of actions taken by bank regulators. *Franklin*, 46 Fed. Cl. at 537.

Here, plaintiffs make the same kind of tort-like allegations that this Court rejected in *Sharp* and *Franklin Savings*, asserting that FHFA exceeded its regulatory authority as conservator when it executed the Third Amendment's "net worth sweep" provisions:

> 73.     The purposes of the Third Amendment – to enrich the Treasury and prepare to wind down Fannie Mae as a private company – were directly at adds with the statutory duties and powers of the FHFA when it acts as Conservator to the Company. . . .
>
> 74.     The Third Amendment . . . was not necessary to put the company in a "sound and solvent condition" or "preserve and conserve the assets and property" of the Company. . . .

Compl. ¶¶ 73-74; *see also id.* ¶ 102.

Plaintiffs' takings claims clearly and necessarily hinge on their allegation that FHFA exceeded its statutory authority, abused its discretion, or committed some sort of malfeasance. Such claims sound in tort, and the Tucker Act expressly precludes the Court from exercising jurisdiction over the complaint. *See Golden Pac. Bancorp*, 25 Cl. Ct. at 770 n.2; *Adams v.*

*United States*, 20 Cl. Ct. 132, 138-39 (1990); *see also Rick's Mushroom Serv., Inc. v. United States*, 521 F.3d 1338, 1343 (Fed. Cir. 2008) (no jurisdiction over professional negligence claim); *Brown*, 105 F.3d at 623 (no jurisdiction over fraud claim); *De-Tom Enters., Inc. v. United States*, 552 F.2d 337, 339 (Ct. Cl. 1977) (finding no jurisdiction to entertain wrongful coercion claim in a takings case).

**V.      Plaintiffs Fail To State A Viable Takings Claim**

Even if plaintiffs could (1) establish standing to bring derivative claims, (2) establish demand futility, and (3) establish jurisdiction over the actions taken by the conservator, which they cannot, the Court should dismiss plaintiffs' complaint for failure to state a takings claim. First, plaintiffs fail to articulate any specific cognizable property interest which could have been taken from Fannie Mae in these circumstances.  Second, plaintiffs do not allege a plausible claim for either a physical or regulatory taking.  Finally, plaintiffs' allegations cannot form the basis for a taking where the Government acted in a proprietary, rather than sovereign, capacity.

**A.      Plaintiffs Have Not Identified A Legally Cognizable Property Interest Of Fannie Mae's That Could Have Been Taken In These Circumstances**

Plaintiffs' takings claims should be dismissed because plaintiffs fail to identify a legally cognizable property interest that could have been taken from Fannie Mae in these circumstances.

The Fifth Amendment states that "private property [shall not] be taken for public use[] without just compensation."  U.S. Const. amend. V.  The Federal Circuit has established a two-part test to consider whether a plaintiff has stated a compensable Fifth Amendment taking:  the Court (1) first determines whether the plaintiff has identified a cognizable property interest; and (2) then determines whether Government action amounted to a taking of the property interest. *See Huntleigh USA Corp. v. United States*, 525 F.3d 1370, 1377-78 (Fed. Cir. 2008); *Am.*

*Pelagic Fishing Co, L.P. v. United States*, 379 F.3d 1363, 1372 (Fed. Cir. 2004).  Plaintiffs' complaint fails to satisfy the first prong of this test.

FHFA, and its predecessor, OFHEO, possessed long-standing regulatory authority to place Fannie Mae into conservatorship and manage Fannie Mae's assets and business.  This regulatory structure limited Fannie Mae's property rights and prevents Fannie Mae from asserting that a legally cognizable property interest was taken from it in these circumstances.

Property interests are, for takings purposes, limited by the statutory and regulatory framework in existence when the property was created.  This legal framework inheres in the property; when the Government acts within the legal framework, no Fifth Amendment taking occurs.  *See, e.g.*, *Acceptance Ins. Cos.*, 583 F.3d at 857-58; *Bair v. United States*, 515 F.3d 1323, 1327-29 (Fed. Cir. 2008); *Am. Pelagic*, 379 F.3d at 1379-81; *M & J Coal Co. v. United States*, 47 F.3d 1148, 1154 (Fed Cir. 1995).  Consistent with this principle, the Federal Circuit has held that regulated financial institutions lack "the fundamental right to exclude the government from [their] property;" therefore, those institutions hold "less than the full bundle of property rights."  *Golden Pac. Bancorp*, 15 F.3d at 1073-74 (quoting *Cal. Hous. Sec., Inc.*, 959 F.2d at 958); *see also Branch v. United States*, 69 F.3d 1571, 1575 (Fed. Cir. 1995); *Am. Cont'l Corp. v. United States*, 22 Cl. Ct. 692, 701 (1991).  The reasoning from the bank cases is even more applicable here, where Fannie Mae from its inception has been a highly regulated entity.

Since its inception, Fannie Mae has been subject to significant Federal oversight and regulation.  Compl. ¶¶ 41-47.  Further, Fannie Mae has long been subject to appointment of a conservator, first under the Safety and Soundness Act, 12 U.S.C. § 4619 (2006), and more recently under HERA, 12 U.S.C. § 4617.  Compl. ¶¶ 45, 47.  In HERA, Congress granted FHFA the authority, with or without the consent of Fannie Mae or its shareholders, to appoint a

conservator "for the purpose of reorganizing, rehabilitating, or winding up the affairs of a regulated entity." 12 U.S.C. § 4617(a)(2).

Therefore, Fannie Mae's property rights were and are subject to the statutory right of its regulator, if determined necessary, to place and operate Fannie Mae in conservatorship. These applicable statutes, as well as regulations promulgated pursuant to these statutes, are "background principles" of Federal law that inhere in Fannie Mae's property interests. *See Acceptance Ins. Cos.*, 583 F.3d at 857-58; *Bair*, 515 F.3d at 1327-28; *Maritrans, Inc. v. United States*, 342 F.3d 1344, 1352 (Fed. Cir. 2003). Because of the limitation on Fannie Mae's property rights, plaintiffs cannot identify a cognizable property interest that was allegedly taken from Fannie Mae, a fundamental element of a takings claim.

To the contrary, the claimed property rights are similar to those rejected in *Golden Pacific* and *California Housing Securities*, where the court held there was no taking because neither the banks nor their shareholders had the right to exclude Government regulators from the banks and bank assets. *Golden Pac. Bancorp*, 15 F.3d at 1074. The investors in the banks did not possess the property right that they alleged had been taken when the Government regulators seized the banks and placed them into receivership. Like the regulators in *Golden Pacific* and *California Housing Securities*, FHFA possessed the statutory right to step in and place Fannie Mae into conservatorship.

Fannie Mae does not possess the right to exclude regulators. *See Golden Pac. Bancorp*, 15 F.3d at 1073-74; *Cal. Hous. Sec., Inc.*, 959 F.2d at 959. Moreover, the plaintiff shareholders chose to invest in regulated entities. *See Golden Pac. Bancorp*, 15 F.3d at 1073 ("Golden Pacific voluntarily entered into the highly regulated banking industry by choosing to invest in the

Bank."); *Cal. Hous. Sec., Inc.*, 959 F.2d at 959.  For these reasons, the asserted property interests are non-cognizable and non-compensable for purposes of an alleged taking.

Here, plaintiffs assert that the Government took Fannie Mae's business value and assets through actions taken while Fannie Mae was in conservatorship.  Yet, Fannie Mae did not possess an unfettered right to its business value and assets when in conservatorship.  FHFA, as conservator, had the authority to take over the assets and conduct the business of Fannie Mae, with all the powers of shareholders, directors, and officers.  12 U.S.C. § 4617(b)(2).  FHFA's statutory authority also includes the authority to "transfer or sell any asset or liability" of Fannie Mae.  12 U.S.C. § 4617(b)(2)(G).  HERA gives FHFA the authority to operate Fannie Mae and broadly authorizes FHFA to take any action that FHFA determines to be in Fannie Mae's best interests.  12 U.S.C. § 4617(b)(2)(J).  Because FHFA possesses authority to manage Fannie Mae during the conservatorship, plaintiffs cannot allege a Fifth Amendment taking, and the Court should dismiss the complaint.

### B.    Plaintiffs Have Not Alleged The Facts Necessary For A Taking

Plaintiffs also fail to allege how the Government's actions amounted to a taking under the Fifth Amendment.

The Supreme Court has recognized only two types of takings, neither of which has occurred here.  The first occurs through the Government's physical invasion or appropriation of private property.  *See Lucas v. S.C. Coastal Council*, 505 U.S. 1003, 1014-15 (1992); *Loretto v. Teleprompter Manhattan CATV Corp.*, 458 U.S. 419, 427 (1982).  The second occurs through Government regulations that unduly burden private property interests.  *See Pa. Coal Co. v. Mahon*, 260 U.S. 393, 415 (1922).  Because plaintiffs do not allege a physical taking through invasion or appropriation of their property, the complaint can only be understood to allege, at

best, a regulatory taking.[7]  As demonstrated below, plaintiffs do not plead even the most basic elements of a regulatory taking.

### 1.    Plaintiffs Cannot Plausibly Allege A Categorical Regulatory Taking

Plaintiffs have not alleged a valid regulatory taking under either a categorical or a *Penn Central* analysis.  Under a categorical, or "total wipeout," theory, a taking may be established by showing that a "regulation denies all economically beneficial or productive use of land." *Lucas*, 505 U.S. at 1015.  The Supreme Court, however, has explained that the categorical takings analysis, introduced by *Lucas*, applies only in the "relatively rare" and "extraordinary circumstance when *no* productive or economically beneficial use of land is permitted." *Id.* at 1017-18.  "The categorical rule . . . applied in *Lucas* states that compensation is required when a regulation deprives an owner of '*all* economically beneficial uses' of his land." *Tahoe-Sierra Pres. Council, Inc. v. Tahoe Reg'l Planning Agency*, 535 U.S. 302, 330 (2002) (quoting *Lucas*, 505 U.S. at 1019).

*Lucas* is therefore applicable only to allegations regarding real property. *See Hawkeye Commodity Promotions, Inc. v. Vilsack*, 486 F.3d 430, 441 (8th Cir. 2007) ("*Lucas* protects real property only"); *see also Branch*, 69 F.3d at 1576 (finding, based on *Lucas*, that principles of takings law applicable to real property do not apply to statutes imposing monetary liability). Plaintiffs have made no allegations relating to land in this case.

In addition, *Lucas* requires a deprivation of a property's entire beneficial use. *Lucas,* 505 U.S. at 1019.   Notwithstanding the execution of the Stock Agreements, including the Third

---

[7]  The Federal Circuit has held that the Government's placing a financial institution into conservatorship or receivership does not give rise to a physical taking. *See Cal. Housing Sec., Inc.*, 959 F.2d at 958.  More broadly, the regulatory seizure of a financial institution is not a physical taking.  *Branch*, 69 F.3d at 1576; *see also Golden Pac.*, 15 F.3d at 1073-74.

Amendment, Fannie Mae continues to operate and its shares continue to be traded.[8]  Plaintiffs cannot establish a "total wipeout" of Fannie Mae's property.  Thus, plaintiffs cannot establish a categorical taking.

### 2.      Plaintiffs Cannot Establish A *Penn Central* Regulatory Taking

If the alleged regulatory taking is not a *Lucas*-type categorical taking, the proper test for determining whether a taking has occurred is described in *Penn Central Transportation Co. v. City of New York*, 438 U.S. 104, 124 (1978).  *See Cienega Gardens v. United States*, 331 F.3d 1319, 1337 (Fed. Cir. 2003).  The *Penn Central* inquiry looks at three factors: (1) the regulation's economic impact, (2) the extent to which the regulation interferes with investment-backed expectations, and (3) the nature or character of the governmental action.  *Id.*  Here, plaintiffs fail to explain how the conservatorship of Fannie Mae and subsequent actions satisfy any of the *Penn Central* factors.  Thus, the Court should dismiss plaintiffs' takings claims.  *See Res. Invs., Inc. v. United States*, 85 Fed. Cl. 447, 511 (2009).

First, plaintiffs fail to adequately allege that Government action resulted in an economic injury to Fannie Mae.  Specifically, plaintiffs fail to account for what would have happened to Fannie Mae in the absence of the Government's investment.  Plaintiffs do not allege that Fannie Mae would have survived absent Government action.  Because plaintiffs have not alleged, nor can they, that Fannie Mae is worse off as a result of the conservatorship than it would have been had the conservatorship not been imposed, the Court should dismiss the complaint.  *See Seiber v. United States*, 364 F.3d 1356, 1370 (Fed. Cir. 2004) ("the existence of economic injury is indispensable to demonstrating a regulatory taking").  The fact that Fannie Mae has received

---

[8]  *See* Stock Price – Fannie Mae, http://www.morningstar.com/invest/stocks/82682-fnma-fannie-mae.html.

more than $116 billion from Treasury to maintain a positive net worth and prevent insolvency (*see* Fannie Mae 2011 10-K, at 9) prevents plaintiffs from plausibly alleging the required economic injury for a takings claim.

With respect to the second *Penn Central* factor, the Federal Circuit has held that regulatory agencies do not interfere with reasonable investment-backed expectations when the regulators place a financial institution into conservatorship or receivership.  *See Golden Pac. Bancorp*, 15 F.3d at 1074; *Cal. Hous. Sec., Inc.*, 959 F.2d at 958-59; *see also Am. Cont'l Corp.*, 22 Cl. Ct. at 697.  Stated differently, the Government's exercise of its long-standing authority to place a regulated financial institution into receivership and liquidate it, or to take actions short of receivership, like placing Fannie Mae into conservatorship and taking authorized actions during that conservatorship, cannot give rise to a "taking."  *See Golden Pac. Bancorp*, 15 F.3d at 1074; *Cal. Hous. Sec., Inc.*, 959 F.2d at 958-59.

The Court of Appeals summarized the reasonable expectations of a regulated financial institution in *Golden Pacific*:

> Put most simply, Golden Pacific could not have reasonably expected that the government "would fail to enforce the applicable statutes and regulations."  Indeed, Golden Pacific's expectations could only have been that the FDIC would exert control over the Bank's assets if the Comptroller became satisfied that the Bank was insolvent and chose to place it in receivership.

15 F.3d at 1074 (citations omitted).

Here, Fannie Mae's reasonable investment-backed expectations are certainly no greater than the expectations in *Golden Pacific*, *California Housing Securities*, and *American Continental*.  As the court noted in *American Continental*, "[b]ecause of the highly regulated nature of federally insured banking and because the government did no more than exercise its authority under statutes that pre-existed plaintiffs' investment, the government's assuming

32

control of [the savings and loan] could not possibly have interfered with plaintiffs' reasonable investment-backed expectations." *Am. Cont'l Corp.*, 22 Cl. Ct. at 697.  Similarly, because Fannie Mae operated in a highly regulated environment, actions following the placement of Fannie Mae into conservatorship could not, as a matter of law, interfere with Fannie Mae's reasonable investment-backed expectations.  *See Golden Pac. Bancorp*, 15 F.3d at 1074.

Finally, with respect to the third *Penn Central* factor, the character of the Government action, the proper analysis focuses on the question of whether the plaintiffs are being forced to bear a financial burden that should properly fall on the greater public.  *See Rose Acre Farms, Inc. v. United States*, 559 F.3d 1260, 1282, 1284 (Fed. Cir. 2009).  The Federal Circuit has recognized that "it is rational to attempt to impose the costs inherent in a certain type of business activity on 'those who have profited from the fruits' of the business in question."  *Branch*, 69 F.3d at 1580 (quoting *Usery v. Turner Elkhorn Mining Co.*, 428 U.S. 1, 18 (1976)).

Here, Fannie Mae benefitted for years from its unique relationship with the Government. Fannie Mae properly bears the costs that arose from the investments that ultimately rendered it unsafe and unsound.  Certainly, United States taxpayers should not be made to indemnify a company for its poor performance.  This point is even clearer here, where taxpayers – not shareholders – intervened and risked billions to rescue Fannie Mae.  Thus, Fannie Mae cannot now claim that it is somehow entitled to profit from the recovery.  Under *Penn Central*, the character of the Government's actions undermines plaintiffs' takings claims.

### C.    Treasury Cannot Be Subject To Takings Liability Because The Third Amendment Was Executed By The Government Acting As A Market Participant Rather Than As The Sovereign

The Court should also dismiss the complaint because a takings claim cannot be premised upon Government action undertaken in a proprietary or commercial capacity.  *See*, *e.g.*, *Alaska Airlines v. Johnson*, 8 F.3d 791, 798 (Fed. Cir. 1993).  Plaintiffs base their claims upon

Treasury's contract with FHFA, acting on behalf of Fannie Mae as conservator.  *See* Compl. ¶¶ 53-58, 65.  When it chose to modify the Stock Purchase Agreement by executing the Third Amendment (and indeed when it chose to invest in Fannie Mae in the first place), Treasury acted in a commercial capacity.  Thus, execution of the Third Amendment could not have triggered any Constitutional obligations under the Fifth Amendment.

### 1.    Courts Distinguish Between Sovereign And Proprietary Acts

The Federal Circuit has long recognized a distinction between actions of the Government as sovereign and actions undertaken in a commercial or proprietary capacity.  When the United States "comes down from its position of sovereignty and enters the domain of commerce" it acts in a "proprietary capacity rather than a sovereign capacity."  *Sun Oil Co.v. United States*, 572 F.2d 786, 818 (Ct. Cl. 1978); *see also Branch Banking & Trust Co. v. United States*, 98 F. Supp. 757, 766 (Ct. Cl. 1951) (possibility of estoppel in Government contracting because the United States is acting in its proprietary capacity); *Cox v. Kurt's Marine Diesel of Tampa, Inc.*, 785 F.2d 935, 936 (11th Cir. 1986) ("in its proprietary capacity the government's activities are analogous to those of a private concern").

The Government's powers to condemn and regulate private property are uniquely sovereign.  The "scope of the 'public use' requirement of the Takings Clause is 'coterminous with the scope of a sovereign's police powers.'"  *Ruckelshaus v. Monsanto Co.*, 467 U.S. 986, 1014 (1984).  The Takings Clause of the Fifth Amendment can require compensation when the Government exercises such sovereign powers.  *See, e.g.*, *Lingle v. Chevron U.S.A. Inc.*, 544 U.S. 528, 537 (2005).  Conversely, where the Government steps down from its sovereign role and enters into commercial transactions, the Government participates in the marketplace in the same manner as a private party and the Takings Clause has no role.  *See Sun Oil*, 572 F.2d at 818; *St.*

34

*Christopher Assocs., LP v. United States*, 511 F.3d 1376, 1385 (Fed. Cir. 2008); *Alaska Airlines*, 8 F.3d at 798; *but see Yuba Goldfields, Inc. v. United States*, 723 F.2d 884, 889 (Fed. Cir. 1983) (discussing in *dicta* the sovereign-proprietary distinction).

Moreover, when the Government participates in the marketplace, it acts in its proprietary capacity regardless of the public policy objectives underlying its action. *St. Christopher Assocs.*, 511 F.3d at 1385 (in making HUD loans, Government acted in proprietary capacity notwithstanding objective to provide affordable housing); *see also United States v. Kimbell Foods, Inc.*, 440 U.S. 715 (1979) (Government deemed an ordinary lender notwithstanding public/welfare objectives).

> ### 2.     Plaintiffs' Takings Claims Against Treasury Are Based Solely On Proprietary Acts

Plaintiffs base their claims upon Treasury's agreements with Fannie Mae. *See* Compl. ¶¶ 53-58, 65.  Because the Government action was undertaken in a proprietary capacity as an investor in an ongoing business as the owner of senior preferred stock and, indeed, was the sort of arrangement that a private party would enter into in similar circumstances, the Court should dismiss the complaint for failure to state a claim upon which relief can be granted. *See St. Christopher Assocs.*, 511 F.3d at 1385.

According to plaintiffs' own complaint, Treasury committed funds to Fannie Mae in exchange for a return on the investment.  Compl. ¶¶ 52-56.  Further, plaintiffs do not take issue with Treasury's decision to commit funds to Fannie Mae in 2008, when Fannie Mae was in dire financial straits.  Nor do plaintiffs take issue with Treasury's provision of hundreds of billions of dollars pursuant to a contract, or its other two amendments, that guaranteed the taxpayers a return on the investment in the form of dividends, a liquidation preference, and a periodic commitment fee.  *See* Compl. ¶¶ 53-58.  The sole focus of plaintiffs' complaint is the 2012

contract amendment that altered the terms of the commercial transaction between Treasury and Fannie Mae. *See* Compl. ¶ 65. Treasury's role in that amendment, however, was no less proprietary than the original contract between Treasury and Fannie Mae. The Third Amendment did not alter the fundamental commercial and proprietary nature of the transaction.

The United States – like a private investor – can have no takings liability to Fannie Mae for a purely commercial transaction undertaken between Fannie Mae and the Department of the Treasury. The Government's actions were, therefore, purely proprietary. Consequently, the complaint should be dismissed.

## VI.     Plaintiffs' Claims Are Not Ripe For Judicial Review

The Court should reject plaintiffs' claims because they are not ripe for judicial review.

Article III of the United States Constitution limits Federal court jurisdiction to "Cases" or "Controversies." U.S. Const. art. III, § 2. The case-or-controversy requirement of Article III "prohibits federal courts from issuing advisory opinions or deciding disputes that are not concrete and adverse." *Mass. Bay Transp. Auth. v. United States*, 21 Cl. Ct. 252, 257 (1990) (citing *United Pub. Workers v. Mitchell*, 330 U.S. 75, 89 (1947)). "Although established under Article I, the [Court of Federal Claims] traditionally has applied the case or controversy requirement [of Article III] unless jurisdiction conferred by Congress demands otherwise." *Commonwealth Edison Co. v. United States*, 56 Fed. Cl. 652, 657 (2003) (quoting *Mass. Bay Transp. Auth.*, 21 Cl. Ct. at 257-58).

The ripeness doctrine "stems from the Article III case or controversy requirement." *Mass. Bay Transp. Auth.*, 21 Cl. Ct. at 258 (citing *Aetna Life Ins. Co. v. Haworth*, 300 U.S. 227, 239-41 (1937); *Buckley v. Valeo*, 424 U.S. 1, 114 (1976)). "The 'basic rationale' of the ripeness doctrine is 'to prevent the courts, through premature adjudication, from entangling themselves in

abstract disagreements.'"  *Maritrans*, 342 F.3d at 1359 (quoting *Abbott Labs. v. Gardner*, 387 U.S. 136, 148 (1967)).  If a plaintiff's claim is not ripe for review, "the court lacks subject matter jurisdiction to adjudicate the dispute."  *Beekwilder v. United States*, 55 Fed. Cl. 54, 60 (2002).  "A plaintiff's failure to present a ripe dispute is a defect that goes to the heart of the court's jurisdiction to hear the claim."  *Id.* (citing *Suitum v. Tahoe Reg'l Planning Agency*, 520 U.S. 725, 735-40 (1997)).

A claim is not ripe for judicial review when it is "contingent [upon] future events that may not occur as anticipated, or indeed may not occur at all."  *Texas v. United States*, 523 U.S. 296, 300 (1998).  In deciding whether a case is ripe for review, the Court must determine (1) "the fitness of the issues for judicial decision," and (2) "the hardship to the parties of withholding court consideration."  *Abbott Labs.*, 387 U.S. at 149.

The Court should dismiss plaintiffs' takings claims on ripeness grounds because the claims are contingent on uncertain, future events.  Plaintiffs allege that the Government has taken the private property of Fannie Mae.  Compl. ¶¶ 1-2, 10, 16-19, 22-24, 86, 108-110.  Specifically, plaintiffs contend that the operation of the "net worth sweep" constituted a taking by "expropriat[ing] all remaining profits and value in the Company . . . without providing just compensation to the Company."  *Id.* ¶ 10.  This, however, is sheer speculation; plaintiffs cannot know when, how, or at what value Fannie Mae will exit the conservatorship.  Therefore, the claims are not ripe for judicial review, and the Court should dismiss them for lack of jurisdiction.

It is undisputed that, before the Third Amendment and its "net worth sweep" provision, Fannie Mae was required to pay a fixed dividend based on the amount Treasury infused into Fannie Mae.  Compl. ¶ 66.  After the Third Amendment, Fannie Mae owes nothing when it is not profitable.  Thus, the effect of the Third Amendment on Fannie Mae's value cannot be

37

ascertained because it is purely speculative and conjectural to assume that Fannie Mae will be profitable over the entire conservatorship.  Indeed, if Fannie Mae were to suffer a setback, Fannie Mae might need to draw additional funds from Treasury under the Stock Agreements to prevent further net worth deficits.  The Government ultimately may lose money under the Third Amendment, notwithstanding its substantial investment of taxpayer dollars.

The question of whether the Government has "taken" anything from Fannie Mae is not ripe because the issue is "contingent [on] future events that may not occur as anticipated, or indeed may not occur at all."  *See Texas*, 523 U.S. at 300.  The ultimate effect of the conservatorship and Third Amendment on Fannie Mae is unknown, and any loss of value allegedly stemming from the conservatorship is purely hypothetical and speculative.  *See Mass. Bay Transp. Auth.*, 21 Cl. Ct. at 260-61.  For this reason, an award of "just compensation" on the terms urged by plaintiffs could result in a substantial and unjust windfall to Fannie Mae at the Government's expense.

Whether and when Fannie Mae will emerge from conservatorship is unknown – Congress may take action, or FHFA may ultimately decide to end the conservatorship or place Fannie Mae into receivership, leading to a liquidation of assets.  At a minimum, the conservatorship must end before the plaintiffs' claims can ripen.  *See Commonwealth Edison Co.*, 56 Fed. Cl. at 658-59; *cf. Maritrans*, 342 F.3d at 1359 (plaintiff's takings claims were ripe for judicial review where "[n]o additional governmental action is required to determine when or if the retirements [of certain vessels] will take place").  Accordingly, plaintiffs' takings claims are not ripe for judicial review,

and the Court should dismiss for lack of jurisdiction. *Beekwilder*, 55 Fed. Cl. at 60 (citing

*Suitum*, 520 U.S. at 735-40).[9]

### **CONCLUSION**

For these reasons, the Court should dismiss plaintiffs' complaint, both for lack of subject

matter jurisdiction and for failure to state claims upon which relief may be granted.

Respectfully submitted,

STUART F. DELERY
Assistant Attorney General

s/Jeanne E. Davidson
JEANNE E. DAVIDSON
Director

---

[9]  The Court should not interpret our ripeness argument to concede that Fannie Mae possesses cognizable property rights for purposes of the Fifth Amendment.

OF COUNSEL:

s/Kenneth M. Dintzer
KENNETH M. DINTZER
Acting Deputy Director

PETER A. BIEGER
Assistant General Counsel
KATHERINE M. BRANDES
Attorney Advisor
Department of the Treasury
1500 Pennsylvania Avenue, N.W.
Washington, D.C. 20220

ELIZABETH M. HOSFORD
GREGG M. SCHWIND
Senior Trial Counsel

KATY M. BARTELMA
SETH W. GREENE
ERIC E. LAUFGRABEN
DANIEL B. VOLK
Trial Attorneys
Commercial Litigation Branch
Civil Division
Department of Justice
P.O. Box 480
Ben Franklin Station
Washington, D.C. 20044
(202) 616-0385
(202) 307-0972 fax
kenneth.dintzer@usdoj.gov

January 23, 2014

Attorneys for Defendant